[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 17, 2011
JOHN LEY
CLERK

_____

No. 10-10774

_____

D.C. Docket No. 5:08-cv-00365-WTH-GRJ

ERIC MYERS,

Plaintiff-Appellant,

versus

TOOJAY'S MANAGEMENT CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 17, 2011)

Before TJOFLAT, CARNES and HILL, Circuit Judges.

CARNES, Circuit Judge:

A section of the Bankruptcy Code prohibits employers from taking certain actions against people who are or have been in bankruptcy. 11 U.S.C. § 525. The first subsection of that section applies to government employers and provides that they may not "deny employment to, terminate the employment of, or discriminate with respect to employment against" a person on that ground. Id. § 525(a). The second subsection provides that a private employer may not "terminate the employment of, or discriminate with respect to employment against" an individual on that ground. Id. § 525(b). The primary issue this appeal presents is whether that second subsection prohibits a private employer from denying employment to an individual on the ground that he is or has been in bankruptcy, even though it, unlike the first subsection, does not say that. Elementary principles of statutory construction and common sense persuade us to answer that question in the negative.

## I.

### A.

In January 2008 Eric Myers filed a Chapter 7 bankruptcy petition with a bankruptcy court in North Carolina. The next month he moved from North Carolina to central Florida looking for a fresh start and found work as a shift supervisor at a Starbucks coffeehouse. In May 2008 the bankruptcy court

discharged Myers' debts. While still a supervisor at Starbucks, Myers came across an advertisement for a managerial position at a local TooJay's Gourmet Deli restaurant. He expressed his interest in the position to Thomas Thornton, the regional manager of TooJay's Management Corporation.

In mid-July 2008 Myers had an interview with Thornton. According to Myers, he was told during the interview that he would be paid about $55,000 per year, that there was a bonus plan, and that there were other benefits such as health insurance. At the end of the interview a two-day on-the-job evaluation of Myers was scheduled, beginning Thursday, July 31, 2008 and ending Friday, August 1. Myers was to receive $100 pay for each of those two days, which was less than half of what he would have been paid if he had actually been hired for the position at his proposed salary.[1] Myers later explained that the on-the-job evaluation "was just so that we could both get a feel for the restaurant, that I would make sure I was comfortable doing it there, that [Thorton] was comfortable with me and the other restaurant managers were comfortable with me."

On July 31, 2008, the first day of the on-the-job evaluation, Myers observed the operation of the restaurant, including its kitchen and its deli, to see how

---

[1] The proposed annual salary for the position, $55,000, would work out to daily pay of approximately $211—$55,000 divided by 260 work days (5 days a week for 52 weeks a year).

TooJay's operated. Later Myers did some kitchen prep work and made a few deli sandwiches. He also completed several personnel forms: a personnel action form, federal tax forms, a medical history form, a payroll deduction authorization form, a form acknowledging receipt of the employee handbook, a driver safety form, and a federal form to verify employment eligibility.

The top of the personnel action form asked the TooJay's manager or corporate officer to "Check Appropriate Box(s)." The options given, among others, were "New Hire," "Rehire," and "Other (explain)." On Myers' form, the "Other(explain)" box was checked and the explanation written next to it was "OJE." Below that, information about Myers was written in the "Employee Information" area, and in the remarks section was written: "2 days of OJE (on the job evaluation) at 100.00 per day." Myers filled out his personal information on the other forms and signed where necessary. Many of the spaces that he filled out or signed were designated on the forms as "Employee Name" or "Employee Signature."

On August 1, 2008, the second day of Myers' on-the-job evaluation, he spent most of the day in the kitchen. He also completed more personnel forms. Those forms included an acknowledgment of receipt of a sexual harassment manual; a non-solicitation and confidentiality agreement; and an authorization and

4

release of personal information for a background check.[2] The background check release permitted TooJay's to "conduct a comprehensive review" including a review of Myers' "credit history and reports." Myers filled out and signed those forms in the appropriate spaces, many of which were designated as being for the "Employee" name or signature. For example, the new hire checklist, which listed all the forms that Myers had filled out, had his name on the "Employee Name" line. The checklist, however, also had the letters "OJE" written and underlined twice at the top of the page.

According to Myers' trial testimony, at the end of his on-the-job evaluation Thornton scheduled him to begin work on August 18 without informing him that his employment would be conditioned on a clean credit history. According to Thornton's testimony, however, he never offered Myers a job. When asked whether he had the authority to hire assistant managers, Thornton responded that he only "had the authority to interview and recommend the hiring of assistant managers." Hiring was contingent on the background check, something that Thornton said he told Myers.

---

[2]Myers also completed a new hire checklist and a motor vehicle information form, though it is not clear from the record on which day of the on-the-job evaluation those forms were filled out.

On August 4, 2008, Myers gave Starbucks his two weeks notice. That was also the date on a letter that TooJay's sent to Myers, informing him: "that we find it necessary to rescind our previous offer of employment. This decision was based in whole or in part, on the information provided us in a Consumer Report . . . . The report was prepared pursuant to an authorization signed by you at the time of the application." Myers received the letter on August 12, 2008.

After Myers received that letter he called Thornton, who told him that he was not hired because of "a financial matter" and that he should contact Sharon Polinski in TooJay's human resources department. He did, and Polinski told him that the only reason he was not hired was that he had filed for bankruptcy, and it was TooJay's policy not to hire people who had done that. On August 13, 2008, Myers wrote a letter to William Korenbaum, TooJay's President and CEO, whom he had never met, asking him to reconsider the company's decision. Myers began by stating "I am writing to you in regard to my employment offer which was withdrawn by your company prior to the commencement of my employment." After explaining why he thought that TooJay's should hire him despite his bankruptcy, Myers closed the letter by expressing his hopes that TooJay's would change its mind and stated that he "look[ed] forward to hopefully becoming a member of the TooJay's family."

6

TooJay's did not respond to Myers' letter.  Shortly after he wrote it, Starbucks let Myers return to his shift supervisor position at the same rate of pay but with fewer hours.  TooJay's eventually sent Myers a check for the payment it had promised him for the two days of his on-the-job evaluation.

B.

On September 2, 2008, Myers filed a lawsuit against TooJay's.  The complaint alleged, among other things, that TooJay's had discriminated against him because of his bankruptcy, in violation of 11 U.S.C. § 525(b), by refusing to hire him and, alternatively, by terminating him from the job after it had hired him.[3] TooJay's and Myers filed cross-motions for summary judgment on the refusal to hire claim.  The district court denied Myers' motion and granted TooJay's based on its conclusion that § 525(b) does not prohibit a private employer from refusing to hire someone because of a bankruptcy.  TooJay's had also moved for summary judgment on the wrongful termination claim, but the district court denied the motion after finding a genuine issue of material fact about the existence of an employment relationship between Myers and TooJay's.

[3]Myers also included in his original complaint a breach of contract claim under Florida law.  And he amended the complaint on September 4, 2008 by adding a claim for unpaid wages under the Fair Labor Standards Act.  The FLSA claim and the state law contract claim were both withdrawn by Myers in his response to TooJay's motion for summary judgment.

During a two-day jury trial, Myers presented several witnesses and testified himself. During his testimony, Myers changed his tune several times about when he was hired. He testified at one point during direct that "I began my employment on . . . July 31st," but at another point said that he was hired "[o]n the 31st or—or August 1st." He testified on cross-examination that he was hired before his on-the-job evaluation began on July 31, 2008, and implied that the hiring took place after his interview with Thornton.[4]

At the close of the evidence, Myers moved for judgment as a matter of law, which the district court denied, sending the wrongful termination claim to the jury. Forty-three minutes later, the jury returned a verdict in favor of TooJay's, responding to the first special interrogatory, "Do you find from a preponderance of the evidence . . . [t]hat the Plaintiff became an employee of the Defendant?" with: "No." The district court entered judgment against Myers.

Myers filed a renewed motion for judgment as a matter of law and a motion for new trial, both of which the district court denied. He then filed a notice of

---

[4]In his opening brief to this Court, Myers asserted that "[i]f [he] successfully completed the [on-the-job evaluation], TooJay's was going to hire him," which contradicts his trial testimony that he had been hired before starting the on-the-job evaluation. He also asserted in his brief that "[a]t the conclusion of the [on-the-job evaluation], Thornton offered [him] the Assistant Manager position, [he] accepted the position, and Thornton told [him] that he was hired." But he states in the same brief that when he received TooJay's letter dated August 4, 2008, he "did not know if he was not being hired or if he was being fired."

appeal from the judgment, specifying the orders granting summary judgment to TooJay's on his refusal to hire claim, denying his renewed motion for judgment as a matter of law on his wrongful termination claim, and denying his motion for a new trial as to that claim. This is his appeal.

## II.

Myers has two claims that TooJay's violated § 525(b). One claim is that it did so by refusing to hire him because he had filed for bankruptcy, and the other claim is that it actually did hire him but then terminated him because he had filed for bankruptcy. The first claim was rejected by the district court on summary judgment, while the second was rejected by the jury after a trial. He contends that the district court erred in granting summary judgment against him on the first claim and, alternatively, that it erred in denying his motion for judgment as a matter of law and his motion for new trial on the second claim.

## A.

We will start with Myer's refusal to hire claim, which is his primary one. Section 525 of the Bankruptcy Code provides individuals who are or have been in bankruptcy with some protection against discriminatory actions by employers. See 11 U.S.C. § 525(a)–(b). The acts against which they are protected depend on whether the employer is a "governmental unit" or a "private employer." Id.

9

Section 525(a), which was enacted first, provides in relevant part that:

> [A] governmental unit may not . . . <u>deny employment to,</u> terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated . . . .

<u>Id.</u> (emphasis added). Section 525(b), by contrast, provides in relevant part:

> No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt . . . .

<u>Id.</u> The conspicuous difference between the two subsections is that § 525(a), the one applying to government employers, explicitly forbids them from either denying or terminating employment because of a bankruptcy, while § 525(b), the one applying to private employers, forbids them from terminating employment because of bankruptcy but says nothing about denying employment because of it.

The district court's reasoning, with which we are in full accord, is as follows:

> A comparison of the words used in subsections (a) and (b) demonstrates that subsection (a) prohibits government employers from "deny[ing] employment to" a person because of his or [her] bankrupt status, whereas subsection (b) does not contain such a prohibition for private employers. Rather, the private sector is prohibited only from discriminating against those persons who are already employees. In other words, Congress intentionally omitted any mention of denial of employment from subsection (b), but specifically provided that denial

10

of employment was actionable in subsection (a). Thus, by its plain language, the statute does not provide a cause of action against private employers for persons who are denied employment due to their bankrupt status. "Where Congress has carefully employed a term in one place but excluded it in another, it should not be implied where excluded."

(citation omitted and first alteration in original). If TooJay's were a governmental unit, Myers would have a refusal to hire claim; because it is not, he does not. Our conclusion flows along with a stream of decisions by other federal courts. See In re Burnett, ___ F.3d ___, No. 10-20250, 2011 WL 754152, at *2 (5th Cir. Mar. 4, 2011); Rea v. Federated Investors, 627 F.3d 937, 940–41 (3d Cir. 2010); Burnett v. Stewart Title, Inc., 431 B.R. 894, 901 (S.D. Tex. 2010); Fiorani v. CACI, 192 B.R. 401, 407 (E.D. Va. 1996); Pastore v. Medford Sav. Bank, 186 B.R. 553, 555 (D. Mass. 1995); In re Stinson, 285 B.R. 239, 250 (Bankr. W.D. Va. 2002); In re Madison Madison Int'l of Ill., 77 B.R. 678, 682 (Bankr. E.D. Wis. 1987).

Myers argues, against the strong current of those decisions and contrary to the clear contextual meaning of the operative language in § 525(b), that we should broadly construe the language "or discriminate with respect to employment" in § 525(b) to include denial of employment. He believes that doing so would better effectuate the Bankruptcy Code's remedial purpose of giving bankruptcy debtors a fresh start. His construction of § 525(b) does not hold water for a number of reasons.

11

First, as we have already noted, § 525(a) expressly prohibits a government employer from refusing to hire someone based on a bankruptcy filing, while § 525(b) does not. The Supreme Court and this Court have often held, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Dean v. United States, ___ U.S. ___, 129 S.Ct. 1849, 1854 (2009) (quotation marks omitted); Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300 (1983) (same) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)); Delgado v. U.S. Att'y Gen., 487 F.3d 855, 862 (11th Cir. 2007).[5]

---

[5]At oral argument Myers for the first time argued that under Gomez-Perez v. Potter, 553 U.S. 474, 128 S.Ct. 1931 (2008), we should not apply the selective inclusion presumption recognized in Russello because Congress enacted § 525(b) seven years after § 525(a). See Gomez-Perez, 553 U.S. at 486, 128 S.Ct. at 1940 ("Negative implications raised by disparate provisions are strongest in those instances in which the relevant statutory provisions were considered simultaneously when the language raising the implication was inserted." (quotation marks and alteration omitted)). But in Gomez-Perez the Court also relied on "the fact that the prohibitory language in [the later-enacted statutory provision] differs sharply from that in the [earlier-enacted one]" and that the later statutory provision "was not modeled after [the earlier one] and is couched in very different terms." Id. at 486–87, 128 S.Ct. at 1940.

In this case, as we have already discussed, the prohibitory language of § 525(b) does not differ materially from § 525(a), except for the conspicuous absence of the clause "deny employment to." Compare 11 U.S.C. § 525(b) with 11 U.S.C. § 525(a). In enacting § 525(b), Congress obviously took the key language of § 525(a) and altered it in the one key respect that we are discussing. The selective inclusion presumption that applies in these circumstances, which has been followed as precedent by this Court for more than 38 years and was recognized by the Supreme Court in Russello and other decisions, is not weakened by the passage of seven years between the enactment of the two subsections of § 525. See United States v. Elliott, 62 F.3d 1304, 1311–12 (11th Cir. 1995) (applying the selective inclusion presumption where the

12

Had Congress wanted to cover a private employer's hiring policies and practices in § 525(b), it could have done so the same way it covered a governmental unit's hiring policies and practices in § 525(a). See Russello, 464 U.S. at 23, 104 S.Ct. at 300. That Congress did not speaks loudly and clearly. United States v. Crape, 603 F.3d 1237, 1246 (11th Cir. 2010); Delgado, 487 F.3d at 862 ("[W]here Congress knows how to say something but chooses not to, its silence is controlling." (quoting CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1226 (11th Cir. 2001)).

The second reason we reject Myers' position has two parts. The first part is that the "or discriminate with respect to employment" language is in both § 525(a) and (b), and it would be illogical to read the identical language in two successive subsections to have different meanings. See Powerex Corp. v. Reliant Energy Servs., Inc., 551 U.S. 224, 232, 127 S.Ct. 2411, 2417 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."); Douglas v. Yates, 535 F.3d 1316, 1320–21 (11th Cir. 2008) ("Similar language contained

---

two provisions had been enacted 20 years apart); see also Wong Kim Bo, 472 F.2d at 722.

Congress had § 525(a) in front of it when it enacted § 525(b). It used the same language for § 525(b) that it had in § 525(a) except it left out "deny employment to" in § 525(b). We presume that Congress did so for a reason.

13

within the same section of a statute must be accorded a consistent meaning." (alterations omitted) (quoting Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 501, 118 S.Ct. 927, 939 (1998))).

The second part of this reason for rejecting Myers' position is that the "or discriminate" language cannot have the meaning he attributes to it in § 525(b). It cannot because that language appears in a sentence providing that "a governmental unit may not . . . deny employment to, terminate the employment of, or discriminate with respect to employment against" a bankruptcy debtor. 11 U.S.C. § 525(a). If "discriminate with respect to employment" included the denial of employment, the words "deny employment" in § 525(a) would be meaningless, pointless, superfluous. And that "is an interpretative no-no." In re Hedrick, 524 F.3d at 1189; see also Corley v. United States, ___ U.S. ___, 129 S.Ct. 1558, 1566 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quotation marks omitted)); United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 520 (1955) ("The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute . . . ." (quotation marks and citations omitted)); Polycarpe v. E&S Landscaping Serv., Inc., 616 F.3d 1217, 1223 (11th Cir. 2010) ("[I]t is our

14

obligation to give meaning to all of the statutory language that Congress enacted."); Huff v. Dekalb County, 516 F.3d 1273, 1280 (11th Cir. 2008) ("[We] must respect the longstanding general principle that courts must not interpret one provision of a statute to render another provision meaningless." (quotation marks and alterations omitted)).

The combined effect of the conclusions from those two syllogisms is this one: The "or discriminate with respect to employment" language in § 525(a) means something other than discrimination in hiring; and it means the same thing in § 525(b) as in § 525(a); therefore, in § 525(b) the language means something other than discrimination in hiring. It must mean, instead, discrimination in some other aspects of employment, such as in promotions, demotions, hours, pay, and so forth.

The third reason we reject Myers' argument is that, in essence, it calls for us to recast the meaning of § 525(b)'s language in a way that will better achieve one of the broad purposes Congress sought to achieve in the Bankruptcy Code, which is to give debtors who go through bankruptcy a fresh start. See Leary v. Warnaco, Inc., 251 B.R. 656, 658–59 (S.D.N.Y. 2000). But "we interpret and apply statutes, not congressional purposes." Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1226 (11th Cir. 2009) (quoting In re Hedrick, 524 F.3d

15

1175, 1188 (11th Cir. 2008) (quotation marks omitted)); see also Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 52, 128 S.Ct. 2326, 2339 (2008) ("[I]t is not for us to substitute our view of policy for the legislation which has been passed by Congress." (quotation marks and alterations omitted)); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79, 118 S.Ct. 998, 1002 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

A statute is not a "Magic Eye" image. When presented with the plain text of a statute, we do not gaze at it blurry-eyed, attempting to see some hidden image formed by the broad purpose that lies behind the legislation. As the Supreme Court and this Court have explained, purpose-driven statutory interpretation "at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action." Bd. of Governors v. Dimension Fin. Corp., 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89 (1986); Friends of the Everglades, 570 F.3d at 1227 ("[T]he legislative process serves as a melting pot of competing interests and a face-off of battling factions."). "The provisions of legislation reflect compromises cobbled together by competing political forces," Friends of the Everglades, 570 F.3d at 1227, and "[i]nvocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself

16

takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent," Dimension Fin. Corp., 474 U.S. at 374, 106 S.Ct. at 689. Judges and courts tempted to bend statutory text to better serve congressional purposes would do well to remember that Congress enacts compromises as much as purposes.

Or to put it in different terms, "we are not licensed to practice statutory remodeling." United States v. Griffith, 455 F.3d 1339, 1344 (11th Cir. 2006); see also Ali v. Fed'l Bureau of Prisons, 552 U.S. 214, 228, 128 S.Ct 831, 841 (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable."); Pavelic & Leflore v. Marvel Entm't Grp., 493 U.S. 120, 126, 110 S.Ct. 456, 460 (1989) ("Our task is to apply the text, not to improve upon it."); Noble State Bank v. Haskell, 219 U.S. 575, 580, 31 S.Ct. 299, 300 (1911) (denial of rehearing) (Holmes, J.) ("We fully understand the practical importance of the question, and the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern."); Friends of the Everglades, 570 F.3d at 1224 ("[W]e are not allowed to add or subtract words from a statute; we cannot rewrite it."); Wright v. Sec'y for Dep't. of Corrs., 278 F.3d 1245, 1255 (11th Cir.2002) ("Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to

'improve' statutes by altering them."); Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000) ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it.").

Our holding that § 525(b) does not apply to refusals to hire is in accord with the holdings of the only two other circuits that have decided the issue. See In re Burnett, ___ F.3d ___, No. 10-20250, 2011 WL 754152, at *2 (5th Cir. Mar. 4, 2011) (holding 11 U.S.C. § 525(b) does not prohibit private employers from denying employment to persons because of their status as a bankruptcy debtor); Rea v. Federated Investors, 627 F.3d 937, 940–41 (3d Cir. 2010) (same).

B.

Myers' other claim, the one for wrongful termination in violation of § 525(b), is doomed by a defect different in kind from the one that defeated his refusal to hire claim. The legal premise of the termination claim is correct: A private employer cannot terminate an employee because he has filed for bankruptcy. But the factual basis he asserts for the claim—that he was hired and then fired because of his bankruptcy filing—was rejected by the jury. After hearing all of the evidence, and being properly instructed, the jury in answering a special interrogatory found that Myers had not proven by a preponderance of the

18

evidence that he had ever become an employee of TooJay's. On that basis the district court entered judgment against Myers on his wrongful termination claim. It thereafter denied his motions for judgment as a matter of law and for a new trial based on the weight of the evidence. Myers contends that both of those rulings were error.

We review <u>de novo</u> a district court's denial of a renewed motion for judgment as a matter of law. <u>Aronowitz v. Health-Chem Corp.</u>, 513 F.3d 1229, 1236 (11th Cir. 2008). And a motion for judgment as a matter of law may be granted only if after examining "all evidence in a light most favorable to the non-moving party" we determine "there is no legally sufficient evidentiary basis for a reasonable jury to find" for that party. <u>Id.</u> at 1236–37 (quotation marks omitted). We review a district court's denial of a motion for new trial only for an abuse of discretion. <u>Lipphardt v. Durango Steakhouse of Brandon, Inc.</u>, 267 F.3d 1183, 1186 (11th Cir. 2001). And "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." <u>Id.</u> at 1186; <u>see also</u> <u>Redd v. City of Phenix City</u>, 934 F.2d 1211, 1215 (11th Cir. 1991) ("When there is some support for a jury's verdict, it is irrelevant what we or the district judge would have concluded.").

19

We have already discussed Myers' waffling on the witness stand about the date on which he believed he had been hired and his inconsistent statements about the purpose of his on-the-job evaluation, all of which undermined his credibility. See supra at 3, 8. It was undisputed that two of the employment forms expressly stated that he was at the restaurant only for an "OJE"—an on-the-job evaluation. And he was paid for those two days less than half the amount he would have received for two days work if he had been an employee. There was also the letter Myers wrote afterwards to TooJay's President and CEO acknowledging that the "employment offer" was "withdrawn by your company prior to the commencement of my employment," and stating that he "look[ed] forward to hopefully becoming a member of the TooJay's family" in the future. See supra at 6–7.

That evidence was more than enough for the jury to discredit Myers' contrary testimony and find that no employment relationship was formed. See Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S.Ct. 2097, 2010 (2000))); see also Owens v. Wainwright, 698 F.2d 1111, 1113 (11th Cir. 1983) ("Appellate courts reviewing a cold record give particular deference to

20

credibility determinations of a fact-finder who had the opportunity to see live testimony."). The district court did not err in denying Myers' renewed motion for judgment as a matter of law.

Nor did the court abuse its discretion in denying Myers' motion for a new trial. The jury's verdict is not against the great weight of the evidence.

**AFFIRMED.**