[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-13947

_____

D.C. Docket No. 1:09-cv-21871-JLK

TIMOTHY FINNERTY,

Plaintiff-Appellee,

versus

STIEFEL LABORATORIES, INC.,
a Delaware Corporation,
CHARLES W. STIEFEL,

Defendants-Appellants.

_____

No. 12-15060

_____

D.C. Docket No. 1:09-cv-21871-JLK

TIMOTHY FINNERTY,

Plaintiff-Appellee,

versus

STIEFEL LABORATORIES, INC.,
a Delaware Corporation,
CHARLES W. STIEFEL,

Defendants-Appellants.

_____

No. 12-15642

_____

D.C. Docket No. 1:09-cv-21871-JLK

TIMOTHY FINNERTY,

Plaintiff-Appellee,

versus

STIEFEL LABORATORIES, INC.,
a Delaware Corporation,
CHARLES W. STIEFEL,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 30, 2014)

Before ANDERSON, Circuit Judge, and MOODY* and SCHLESINGER,**
District Judges.
_____

*Honorable James S. Moody, Jr., United States District Judge for the Middle District of Florida,
sitting by designation.

**Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of
Florida, sitting by designation.

2

ANDERSON, Circuit Judge:

Plaintiff Timothy Finnerty filed this lawsuit against Stiefel Laboratories, Inc. ("SLI") and its chief executive officer, Charles Stiefel (hereinafter jointly referred to as "SLI"), alleging violations of § 10(b) of the Securities Exchange Act of 1934 and accompanying Rule 10b-5. The allegation is that SLI withheld material information about preliminary merger negotiations that it was obliged to disclose. The case was tried before a jury which returned a verdict for Finnerty. The district court subsequently denied SLI's renewed motion for judgment as a matter of law and alternative motion for a new trial. SLI appeals from that denial, arguing principally that it had no duty to disclose the merger negotiations, that the negotiations were immaterial, and that the district court erroneously refused to give a request to charge to the jury. For the reasons that follow, we affirm.

## I.    Background.[1]

A. The Blackstone investment.

SLI was a privately-held pharmaceutical company controlled by the Stiefel family from its founding in 1847 until 2009, when it merged with GlaxoSmithKline ("GSK"). SLI took great pride in its privately-held status; the

---

[1] In accordance with our standard of review for renewed judgment as a matter of law, we present the facts in the light most favorable to Finnerty. See SEC v. Ginsburg, 362 F.3d 1292, 1296 (11th Cir. 2004).

Stiefel family brought up this fact at nearly every company meeting and impressed upon employees their commitment to keeping SLI under the family's control.

In August 2007, SLI announced a $500 million minority investment by The Blackstone Group ("Blackstone"). Under the terms of the investment, Blackstone purchased preferred shares at approximately $60,000 per share. Additionally, in connection with the investment, Blackstone acquired the right to name one member of SLI's board of directors. Sometime in 2008, Blackstone named Anjan Mukherjee, a managing director at Blackstone, to SLI's board.

Anticipating the speculation that might result from Blackstone's investment, on August 9, 2007, SLI issued a press release that stated: "[SLI] . . . will continue to be privately held, and the Stiefel family will retain control and continue to hold a majority-share ownership of the company." That same day, Charles Stiefel sent an e-mail to SLI employees assuring them that "[SLI] will continue to be a privately held company operating under my direction as Chairman, Chief Executive Officer, and President." A "Frequently Asked Questions" document attached to the e-mail further informed employees:

> Will [SLI] be going public?
> There are currently no plans for [SLI] to become a publicly traded company. Blackstone will have a defined exit arrangement with [SLI] at the end of eight years, at which point [SLI] may choose to buy back its shares or exercise other options, one of which might be an initial public offering. Senior management continues to evaluate all options when looking at the long-term financial needs of the company.

4

B. Finnerty's "put" election.

Finnerty worked as a sales representative for SLI from 1986 until he was terminated on August 29, 2008, along with numerous others in a reduction of force. As an employee, Finnerty participated in SLI's Employee Stock Bonus Plan ("ESBP"). Upon termination of employment, ESBP participants became entitled to a distribution of the vested benefits in their accounts paid in the form of SLI stock. Participants also received a "put" option on the distributed stock, which allowed them to require SLI to buy back the stock at a fair market value during a certain window of time.

Although Finnerty was eligible for his vested ESBP benefits after his termination, he initially elected to defer the distribution. But in November 2008, Finnerty received a letter from SLI announcing major changes to the ESBP. Shortly thereafter, Finnerty received another letter reminding him of the opportunity to take a distribution and providing him with the necessary paperwork. Concerned about the impending changes, on January 6, 2009, Finnerty executed a form irrevocably electing to receive his distribution of SLI stock and to "put" the stock to SLI at the then-effective fair market value of $16,469 per share. SLI completed this transaction on February 13, 2009.

C. The sale of SLI.

5

Unknown to Finnerty, the Stiefel family had been exploring the possibility of selling SLI since November of 2008. Earlier that month, Mukherjee learned that the pharmaceutical giant Sanofi-Aventis was interested in an acquisition. Mukherjee advised the Stiefels that they should "either sell [SLI] right now or wait five years," and he estimated that the acquisition price could be as high as "3–5 times sales," with the price that Blackstone paid ($60,000 per share) as the floor. On November 26, 2008, Charles Stiefel met with his sons and they decided to "move on" the sale.

On December 8, 2008, a team from Blackstone Advisory Services, an affiliate of Blackstone, presented to the Stiefels a marketing strategy and timeline for pursuing a sale, including a list of potential acquirers and a valuation analysis. The analysis suggested that the potential acquisition price could be in the range of $2.25 to $4 billion (around 2.5 to 4.5 times revenue). Later that month, Charles Stiefel met with the chief executive officer of Sanofi-Aventis to discuss how the two companies could operate together. No discussion of prices or terms took place at this meeting. Thereafter, around December 30, 2008, SLI hired Blackstone Advisory Services to advise on a potential sale.

In January 2009, SLI executed a confidentiality agreement with Sanofi-Aventis and contacted several other pharmaceutical companies to gauge their interest. Eventually, two companies—Sanofi-Aventis and GSK—submitted non-

binding bids for SLI.  On April 20, 2009, SLI and GSK agreed to a transaction in which holders of SLI stock received approximately $68,515.29 per share, with the possibility of another $7,186.91 per share if certain performance conditions were met—more than four times the value received by Finnerty when he exercised his "put" option.

D. District court proceedings.

Finnerty brought suit against SLI on January 14, 2011, alleging violations of the Employee Retirement Income Security Act ("ERISA") and § 10(b) of the Securities Exchange Act of 1934.[2]  The securities fraud count was tried in May of 2012 on the theory that SLI had a duty to disclose to Finnerty information relating to its merger negotiations with Sanofi-Aventis but failed to do so.

At trial, the district court allowed Finnerty to elicit testimony that SLI had on occasion suspended the distribution of benefits from the ESBP (i.e., imposed a "blackout").  SLI argued that this testimony misled jurors into believing that it could have refused to honor Finnerty's "put" election and thus prejudiced its defense on the element of scienter.  SLI sought to refute by testimony about its legal obligations under the terms of the ESBP and applicable federal law, but the district court excluded the testimony as impermissible legal opinion.  However,

---

[2] This lawsuit was originally brought as a class action.  The district court denied class certification on July 21, 2011, and we subsequently denied the plaintiffs' petition for a review of the order.  The district court thereafter granted summary judgment against two of the three named plaintiffs, leaving only Finnerty's claims.  Finnerty had named other SLI executives and directors as defendants, but those individuals are not a part of this appeal.

SLI did introduce other testimony to the effect that it could not have imposed a "blackout" because it did not have time for the required thirty days' notice and because it believed it could not disclose the reasons for the "blackout." SLI also requested a jury instruction on its legal obligations—"With certain limited exceptions not applicable to this case, under federal law and the terms of the ESBP, [SLI] was required to purchase [Finnerty's] shares of stock from him as soon as he exercised his irrevocable put right on January 6, 2009"—which the district court denied.

The jury returned a verdict in favor of Finnerty and awarded him compensatory damages of $1,502,484.90. The district court subsequently denied SLI's renewed motion for judgment as a matter of law and alternative motion for a new trial. This timely appeal followed.

## II.    Discussion.

A. Judgment as a matter of law.

SLI argues that the district court erred in denying his motion for judgment as a matter of law. We review de novo the district court's decision on this question. Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1287 (11th Cir. 2011). Our task is to consider whether the evidence, viewed in the light most favorable to Finnerty, is legally sufficient to support the verdict in his favor. See id. Only if no reasonable jury could have found for Finnerty will we reverse. See id.

8

1. *Sufficiency of evidence of actionable omission.*

To succeed on a § 10(b) securities fraud claim, "a plaintiff must establish (1) a false statement or omission of material fact (2) made with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's injury." Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997). "[A] defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir. 1986). We have held that a duty to disclose may arise from a defendant's previous decision to speak voluntarily. See id. Specifically, a duty exists to update prior statements if the statements were true when made, but misleading or deceptive if left unrevised. See id.

There is, of course, no obligation to update a prior statement about a historical fact. See Stransky v. Cummins Engine Co., 51 F.3d 1329, 1332 n.3 (7th Cir. 1995) ("[T]hat circumstances subsequently change cannot render an historical statement false or misleading."). The duty attaches only to forward-looking statements—statements that contain "an implicit factual representation that remain[s] 'alive' in the minds of investors as a continuing representation." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997). Determining if such an implicit representation was present and whether the representation subsequently became misleading involves an assessment of "the

9

meaning of the statement to the reasonable investor and its relationship to truth." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1305 (11th Cir. 2011) (internal quotation marks omitted); cf. Burlington, 114 F.3d at 1432 (stating that determining whether a disclosure contains an implicit continuing representation "is a function of what a reasonable investor expects"); San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 810 (2d Cir. 1996) (concluding that a prior statement did not give rise to a duty to update because the statement could not have "led any reasonable investor to conclude" that the company had made a commitment).  Whether a company came under an obligation to revise a past disclosure is normally an issue for the finder of fact.  See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) ("[W]hether nondisclosure . . . renders the original disclosure misleading[] remain[s a] question[] for the trier of fact . . . ."); Clay v. Riverwood Int'l Corp., 157 F.3d 1259, 1268–69 (11th Cir. 1998) (concluding that "no reasonable jury could find" that revision was necessary to prevent an "extremely non-committal" disclosure from being misleading), vacated in part on other grounds, 176 F.3d 1381 (11th Cir. 1999).

   In this case, SLI denies that it had a duty to disclose the preliminary merger negotiations with Sanofi-Aventis.  Conversely, Finnerty argues that SLI's August 2007 statements that it "will continue to be privately held, and the Stiefel family

will retain control and continue to hold a majority-share ownership of the company" gave rise to a duty to update when SLI considered itself to be a serious acquisition target. The jury, by its verdict, decided this issue in favor of Finnerty. We conclude that the evidence in the record is sufficient to support this determination.

The evidence at trial showed that SLI executives took great pride in the fact that the company had been privately held and controlled by the Stiefel family throughout its 162-year existence. Finnerty testified that the company's privately-held status "was brought up in virtually every meeting." A former member of SLI's board of directors similarly explained that it was "always the philosophy of the [Stiefel] family and the company" that SLI would remain privately owned. Another former SLI employee stated that the Stiefel family gave employees a "very clear understanding" that the family had "no plans of selling the company or going public." The employee specifically recounted a meeting that took place shortly before the merger with GSK was announced, at which a member of the Stiefel family told employees that SLI "was 160 years in the family" and there were no plans "to change that."[3]

---

[3] Finnerty was not present at this meeting and so could not have relied on this statement. Otherwise, the statement might be actionable as an affirmative misrepresentation because SLI was actively engaged in preliminary merger discussions with Sanofi-Aventis at the time the statement was made. Cf. FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1298 (11th Cir. 2011) (holding that a statement is actionable when it could "mislead a reasonable investor into believing" an untrue fact). On the facts of this case, the statement is not evidence of a

11

This context is significant.  The jury could have reasonably concluded that the investors who were also SLI employees attached a special significance to the statements that SLI "will continue to be privately held" because the statements were reinforced by the company's history and longstanding philosophy.  An investor who was unfamiliar with this history might have viewed the statements as too vague to be consequential; there was, after all, no indication of whether SLI intended to be privately held "for any given amount of time or even if business circumstances dictate to the contrary."  Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 417 (1st Cir. 1989) (concluding that an open-ended promise to operate target entity as an independent subsidiary is not inconsistent with decision to merge target entity into the parent company two years later).  But SLI employees, who had heard generations of Stiefels express their commitment to keeping SLI under the family's control, could reasonably have understood the "will continue to be privately held" statements to be assurances that SLI remained unavailable for acquisition even after Blackstone's investment.  Cf. Philip Morris, 75 F.3d at 810 (determining that a "hyped" plan could induce reasonable expectations among investors, but a "single, vague statement" could not).

_____

material misrepresentation on which Finnerty relied, but it is nonetheless evidence from which a jury could infer SLI's history of telling its employees that it was not available for acquisition.

12

The jury could have further inferred that SLI considered itself to be a serious acquisition target by the time it engaged Blackstone Advisory Services to advise on a potential sale.  Retaining an investment bank, after corporate executives had met and begun to negotiate, "arguably demonstrate[s]" that a company's intention to merge "has moved beyond its incipient stages and ripened into purposeful action."  Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180, 182 (2d Cir. 2001).  The jury could have found that nondisclosure of SLI's interest in a merger with Sanofi-Aventis misled the investors who were also SLI employees into believing that the company remained unavailable for acquisition, when in fact it was in engaged in serious talks with a potential acquirer.  In other words, the jury could have reasonably concluded that nondisclosure rendered SLI's "will continue to be privately held" statements misleading or deceptive to the investors who were also SLI employees, thus giving rise to a duty to update.

SLI relies heavily on another part of the statements made to employees in August 2007—the Frequently Asked Questions document.  In response to the hypothetical question "Will [SLI] be going public?", the document answered:

> There are currently no plans for [SLI] to become a publicly traded company.  Blackstone will have a defined exit arrangement with [SLI] at the end of eight years, at which point [SLI] may choose to buy back its shares or exercise other options, one of which might be an initial public offering.  Senior management continues to evaluate all options when looking at the long-term financial needs of the company.

13

Resting on the "evaluate all options" language, SLI contends that it had indicated its willingness to entertain acquisition offers and thereby neutralized any misleading effects of its statements that SLI "will continue to be privately held."

We do not dispute that the phrase "evaluate all options" can plausibly be construed in the manner that SLI urges. But we think other interpretations are equally tenable. For instance, the term "options" could refer back to the preceding sentence: "Blackstone will have a defined exit arrangement with [SLI] at the end of eight years, at which point [SLI] may choose to buy back its shares or exercise other options . . . ." Such a reading would have created the understanding among employees that SLI had not decided on an exit arrangement with Blackstone and was considering all possible alternatives. Because the exit would not take place for another eight years, a reasonable employee would have had no reason to think that the "evaluate all options" language qualified or contradicted the declarations that SLI "will continue to be privately held." It was up to the jury to choose among these competing, permissible interpretations of the evidence. See SEC v. Ginsburg, 362 F.3d 1292, 1301 (11th Cir. 2004). Accordingly, we decline to disturb the verdict on this ground.[4]

---

[4] The jury in this case entered a general verdict. As a result, because we conclude that the "will continue to be privately held" statements gave rise to a duty to update when SLI considered itself to be a serious acquisition target, we need not address Finnerty's other theories of non-disclosure. See Maiz v. Virani, 253 F.3d 641, 672–73 (11th Cir. 2001) (endorsing the argument that "when reviewing a decision on a motion for judgment as a matter of law in a civil case, if any one basis for the verdict is valid, the judgment must be affirmed").

14

It is important to appreciate the limits of our decision. We hold only that SLI had a duty to disclose facts that were necessary to make its "will continue to be privately held" statements not misleading. In other words, SLI was under no obligation to disclose the existence or the status of its merger negotiations with Sanofi-Aventis; it could have merely said that a sale of the company was under consideration.

Further, we do not decide whether SLI had an immediate duty to update the public when the negotiations with Sanofi-Aventis became serious. Rather, we hold that SLI had a duty to update Finnerty at least before it repurchased shares of its own stock from him.[5] We think it may well be desirable to entrust the timing of disclosures to the business judgment of corporate officers where, as here, a duty to update exists but silence would yield benefits for investors as a group, so long as the company and its insiders abstain from trading in the company's securities during this period of nondisclosure.[6] Cf. Weiner v. Quaker Oats Co., 129 F.3d

---

[5] In other words, while we hold that SLI had a duty to disclose the fact that a sale was under active consideration, we leave open the issue of precisely when and to whom the requisite disclosure must be made. Although there may be no practical difference in this case, we emphasize that we do not answer the question of whether SLI is a "close corporation" with a fiduciary duty to disclose material facts before trading in its own stock. See Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 435 (7th Cir. 1987); Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001).

[6] We recognize that the Supreme Court in Basic Inc. v. Levinson expressed some doubt as to "whether secrecy" in preliminary merger discussions "necessarily maximizes shareholder wealth." 485 U.S. 224, 235, 108 S. Ct. 978, 985 (1988). Our Circuit has, however, acknowledged post-Basic that corporations may "have a justifiable reluctance" to publicly disclose preliminary merger discussions because disclosure "could spark competition that might

15

310, 316 (3d Cir. 1997) ("Whether an amendment [updating prior speech] is sufficiently prompt is a question that must be determined in each case based upon the particular facts and circumstances." (internal quotation marks omitted)); SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 850 n.12 (2d Cir. 1968) ("[W]here a corporate purpose is thus served by withholding the news of a material fact, those persons who are thus quite properly true to their corporate trust must not during the period of non-disclosure deal personally in the corporation's securities . . . ."). "Rule 10b-5 is about fraud, after all, and it is not fraudulent to conduct business in a way that makes investors better off." Basic Inc. v. Levinson, 485 U.S. 224, 235 n.11, 108 S. Ct. 978, 985 n.11 (1988) (emphasis omitted) (quoting Flamm v. Eberstadt, 814 F.2d 1169, 1177 (7th Cir. 1987)). But secrecy ceases to be in the investors' interests when corporate insiders exploit the non-public information in their possession and engage in self-dealing. Cf. United States v. O'Hagan, 521 U.S. 642, 658, 117 S. Ct. 2199, 2210 (1997) ("[T]rading on misappropriated [non-public] information 'undermines the integrity of, and investor confidence in, the securities markets'" (quoting 45 Fed. Reg. 60,412 (September 12, 1980)). It makes scant sense to allow corporate officers who are privy to inside information to take unfair advantage of "outside" stockholders by causing the corporation to buy and

drive down bids, or could make potential bidders reluctant to make offers at all." Smith v. Duff & Phelps, Inc., 891 F.2d 1567, 1574 (11th Cir. 1990).

16

sell shares at favorable prices so as to increase the value of the officers' own equity. See Smith v. Duff & Phelps, Inc., 891 F.2d 1567, 1574 (11th Cir. 1990) (warning that a company's reluctance to disclose merger information to potential retirees may be motivated by "its fear that if the retirees knew of the possible merger, they would wait to retire until they could get the largest return, thus depriving the majority shareholders of larger profits").

We need not decide here whether SLI could have postponed the duty to update their prior statements by abstaining from trading in the company's securities because that is not the case before us. It is undisputed that SLI bought back shares of its own stock from Finnerty without first informing him that a sale of the company was under serious and active consideration. SLI argues that it was required by federal law to buy back the shares, even while in possession of undisclosed material information, because the securities were distributed pursuant to a stock bonus plan. This issue is explored below in Part II.B, infra. Furthermore, even if federal law does foreclose the option of abstention, it would not affect our disposition. A corporation that is unable to lawfully postpone its duty to disclose is not absolved of that duty. The Supreme Court has made clear that it is not the role of courts to interfere with the "'philosophy of full disclosure'" embodied in the securities laws. Basic, 485 U.S. at 230, 108 S. Ct. at 983 (quoting Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477, 97 S. Ct. 1292, 1303 (1977)).

17

"[C]reating an exception to a regulatory scheme founded on a prodisclosure legislative philosophy, because complying with the regulation might be 'bad for business,' is a role for Congress, not this Court." Id. at 239 n.17, 108 S. Ct. at 987 n.17.[7]

2. *Sufficiency of evidence that the omitted information was material.*

SLI also argues that Finnerty did not provide sufficient evidence to permit a reasonable jury to find that its merger talks with Sanofi-Aventis were material as required by Rule 10-b. For an omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 231–32, 108 S. Ct. at 983 (internal quotation marks omitted). With respect to contingent or speculative information such as preliminary merger discussions, materiality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Id. at 238, 108 S. Ct. at 987 (internal quotation marks omitted); accord Ginsburg, 362 F.3d at 1302. The Supreme Court has instructed that "a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels" and

---

[7] See also New York Stock Exchange Listed Company Manual § 202.03 (2014) ("If rumors or unusual market activity indicate that information on" merger negotiations "has leaked out, . . . an immediate candid statement to the public as to the state of negotiations . . . must be made directly and openly. Such statements are essential despite the business inconvenience which may be caused . . . ." (emphasis added)).

18

consider, inter alia, "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." Basic, 485 U.S. at 239, 108 S. Ct. at 987.  The materiality inquiry "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S. Ct. 2126, 2133 (1976); accord Ginsburg, 362 F.3d at 1302.

We conclude that SLI's discussions with Sanofi-Aventis were sufficiently advanced by January 6, 2009, when Finnerty exercised his "put" option, for a jury to find them material.  By January of 2009, Charles Stiefel had met with the chief executive officer of Sanofi-Aventis to discuss the strategic fit between the two companies, and SLI had engaged Blackstone Advisory Services to facilitate a possible sale.  See Castellano, 257 F.3d at 180, 182 n.5 (holding that tentative merger discussions had "advanced to the point that they would not have been considered immaterial as a matter of law" where the defendant company had hired an investment bank and the CEOs and CFOs of the transacting parties had "met to discuss possible structures for the transaction, as well as how the companies' operations would fit together").  Moreover, the valuation analysis conducted by Blackstone Advisory Services had shown that the potential acquisition price could be in the range of 2.5 to 4.5 times revenue, which would be of considerable

19

magnitude for SLI shareholders.  See id. at 185 (indicating that the anticipated magnitude of the potential transaction—such as a "doubling or tripling of the value of [shareholders'] holdings"—is probative of materiality); Basic, 485 U.S. at 240 n.19, 108 S. Ct. at 988 n.19 (citing approvingly to SEC v. Shapiro, 494 F.2d 1301, 1306–07 (2d Cir. 1974), which held that "in light of projected very substantial increase in earnings per share, negotiations [were] material, although merger still less than probable").  Under these circumstances, the jury could certainly find that by January 6, 2009, a reasonable investor would view SLI's negotiations with Sanofi-Aventis as "significantly alter[ing] the 'total mix' of information made available."  Basic, 485 U.S. at 232, 108 S. Ct. at 983 (internal quotation marks omitted).[8]

## B.  Motion for new trial.

SLI also appeals the denial of its Rule 59 motion for a new trial.  "We review a district court's denial of a motion for new trial only for an abuse of discretion."  Myers, 640 F.3d at 1287.  We also review a district court's refusal to give a requested jury instruction for abuse of discretion.  See Lamonica v. Safe

---

[8] Because we conclude that the omitted information in this case meets the materiality standard, we readily reject SLI's challenge to the damages award.  SLI concedes that "if the jury decides plaintiff would not have consummated the sale, it may then award the difference between the sale price and the value of the stock at a reasonable time in the future."  Appellant's Br. at 34 (alterations in original) (quoting Dupuy v. Dupuy, 551 F.2d 1005, 1025 (5th Cir. 1977)).  The jury here reasonably found that knowledge of the undisclosed merger negotiations would have affected Finnerty's decision to sell.  Finnerty is thus entitled to recover the difference between the price he received and the value of SLI stock under the terms of the GSK merger agreement.

20

Hurricane Shutters, Inc., 711 F.3d 1299, 1309 (11th Cir. 2013). "An abuse of discretion is committed only when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." Id. (internal alteration and quotation marks omitted).

1.  *Jury instruction on "put" option.*

SLI contends that the district court erred by refusing to give the following jury instruction: "With certain limited exceptions not applicable to this case, under federal law and the terms of the ESBP, [SLI] was required to purchase [Finnerty's] shares of stock from him as soon as he exercised his irrevocable put right on January 6, 2009." SLI claims that the district court's evidentiary rulings—with respect to SLI's ability to impose a "blackout"—allowed Finnerty to "create the false impression that [it] could have refused to honor Finnerty's put election" and that scienter can be inferred from its failure to do so.[9] The requested instruction,

---

[9] SLI does not clearly argue on appeal that the district court abused its discretion in admitting evidence concerning "blackout" periods, so we do not consider that issue. See Willard v. Fairfield S. Co., 472 F.3d 817, 825 n.4 (11th Cir. 2006).

SLI does suggest, however, that the district court erred in excluding testimony that SLI was required by law to honor Finnerty's "put" exercise and that thirty-day advanced notice would have been required to impose a "blackout" period. The district court excluded this testimony because it was offered by witnesses who were not qualified as experts and because it constituted a legal opinion. This was not an abuse of discretion. U.S. law "is properly considered and determined by the court whose function it is to instruct the jury on the law; [U.S.] law is not to be presented through testimony and argued to the jury as a question of fact." United States v. Oliveros, 275 F.3d 1299, 1306–07 (11th Cir. 2001).

SLI insists, was necessary to cure the prejudice caused by this alleged misrepresentation.

Before we address the parties' arguments, a few words are in order regarding the difference between the ESBP's obligation to distribute benefits (e.g., securities) to plan participants upon request and SLI's obligation to honor "put" options on the distributed securities.

A stock bonus plan, like the ESBP, is an employee compensation program, established and maintained by an employer, which distributes benefits in the form of cash or stock in the employer company. See 26 C.F.R. § 1.401-1(a)(2)(iii). Contributions to the plan are allocated to individual participant accounts, and benefits are distributed to plan participants or their beneficiaries according to a predetermined formula, such as upon retirement, severance, or death. See id. § 1.401-1(b)(1)(ii)–(iii). To qualify for certain tax-favored treatment, a stock bonus plan must meet the requirements of Internal Revenue Code § 401(a) and, in turn, § 409(h). See 26 U.S.C. § 401(a)(23); John D. Colombo, Paying for Sins of the Master: An Analysis of the Tax Effects of Pension Plan Disqualification and a Proposal for Reform, 34 Ariz. L. Rev. 53, 56–58 (1992). Section 409(h)(1) provides that "a participant who is entitled to a distribution from the plan . . . has a right to demand that his benefits be distributed in the form of employer securities," and that "if the employer securities are not readily tradable on an established

22

market," the participant "has a right to require that the employer repurchase employer securities under a fair valuation formula." 26 U.S.C. § 409(h)(1).

Because stock bonus plans are considered defined contribution pension plans, they are also regulated by ERISA. As relevant for purposes of this appeal, ERISA restricts the ability of plan administrators to impose "blackout" periods— i.e., to "suspen[d], limit[], or restrict[]" participants' ability to "obtain distributions from the plan" for more than three consecutive business days. See generally 29 U.S.C. § 1021(i). It provides that no "blackout" period may take effect until at least thirty days after written notice of the "blackout" is provided to plan participants or their beneficiaries. Id. § 1021(i)(1)–(2). A suspension, limitation, or restriction "which occurs by reason of the application of the securities laws," however, is exempt from the definition of "blackout" period, id. § 1021(i)(7)(B)(i), as well as the thirty-day notice requirement.

Significantly, ERISA's "blackout" provisions do not affect an employer's obligation to honor "put" options on the distributed securities. The notice requirements apply solely to suspensions, limitations, or restrictions on plan participants' ability "to obtain distributions" of securities from the stock bonus plan. Id. § 1021(i)(7)(A). In other words, a participant can "put" securities which had previously been distributed, and the employer may be obligated to honor the "put," even during a "blackout" period. SLI is thus wrong to suggest that the

23

ESBP's ability to impose a "blackout," with or without thirty days' advanced notice, is directly relevant to the issue of whether SLI could lawfully refuse to repurchase Finnerty's stock once Finnerty exercised his "put" option. The ability to impose a "blackout" is only indirectly relevant; e.g., if SLI had imposed a "blackout" before Finnerty elected to have the stock distributed, then Finnerty would not have had the stock to "put."

SLI's argument on appeal reflects a fundamental misunderstanding of the difference between the ESBP's obligation to distribute Finnerty's benefits upon request and SLI's obligation to honor his "put" option on the distributed securities. SLI argues that the requested instruction—i.e., "With certain limited exceptions not applicable to this case, under federal law and the terms of the ESBP, [SLI] was required to purchase [Finnerty's] shares of stock from him as soon as he exercised his irrevocable put right on January 6, 2009"—was necessary to dispel any notion among the jurors that "SLI could have refused to honor Finnerty's put election" after he exercised it. However, Finnerty did not argue to the jury that SLI could have declined to purchase the stock after Finnerty exercised his "put" option on January 6, 2009. Rather, Finnerty argued to the jury that SLI could have imposed a "blackout" before Finnerty elected on January 6, 2009, to receive a distribution

24

of securities from the ESBP (thus preventing Finnerty from having any stock to "put").[10]  Specifically, Finnerty's counsel told the jury at closing:

> You heard testimony . . . that there was a period of time, from the end of the fiscal year until the new price came out, that they could not sell their stock . . . . Nobody could take a distribution . . . . <u>When [the Stiefels] started considering the sale of this company</u>, why couldn't they do that?

Tr. 555 at 47–48 (emphasis added).

Having carefully reviewed the record, we are not persuaded that the jury was misled into believing that SLI could have lawfully declined to buy back the securities from Finnerty after it was "put."  Finnerty presented no evidence and no argument to the jury with respect to whether SLI had such a legal obligation.  The only evidence introduced by either party relevant to SLI's legal obligation to Finnerty once he exercised his "put" was the testimony elicited by SLI that it was "required to" honor Finnerty's "put" option and repurchase Finnerty's shares after the option was exercised and the conflicting evidence as to whether SLI could have imposed a "blackout."[11]  Thus, we are not persuaded that the jury was laboring

---

[10] Finnerty's argument was a comment on the testimony that he had elicited that SLI had on occasion suspended distributions to ESBP participants.  SLI presented evidence to the contrary— e.g., to the effect that SLI could not have imposed a "blackout" because it did not have time to give the required thirty days' notice and because it could not give the reasons for the "blackout" without publicly disclosing the sensitive merger negotiations.

[11] SLI argues on appeal that it could not have imposed a suspension on benefits distributions without complying with ERISA's thirty-day notice requirement for "blackout" periods, but it does not clearly challenge in its briefs on appeal any failure to give an instruction to that effect.

25

under any misimpression with respect to whether SLI had a legal obligation to buy the stock once Finnerty exercised his "put"; we are not persuaded that there was a misimpression that required a correction. Our review of the entirety of the jury instructions, the arguments of counsel, and the relevant parts of the record leaves us confident that the failure of the district court to give the requested instruction, even if a correct statement of the law, had no effect on the verdict. Because SLI has demonstrated no prejudice from the district court's refusal to give the instruction, we find no abuse of discretion here.[12]

Thus, there is no preserved, reversible error based on a refusal by the district court to charge the jury with respect to whether SLI could have imposed a "blackout" period.

Moreover, even if SLI had preserved error in that regard, SLI elicited testimony at trial that it could not impose a "blackout" in connection with the merger discussions because it did not "have 30 days notice" and could not "disclose the reasons why," and Finnerty never argued to the jury that ERISA's thirty-day notice requirement did not apply in this case. Because Charles Stiefel and his sons decided on November 26, 2008, to "move on" the sale, a reasonable jury could find that SLI could have voluntarily given the notice of a "blackout" more than thirty days before Finnerty elected to take his distribution from ESPB and elected to exercise his "put."

Thus, even if SLI had preserved error with respect to an instruction on the "blackout" provisions, the error would have been harmless. Cf. Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1235 (11th Cir. 2004) (holding that failure to give a requested instruction was not reversible error where the requesting party had an opportunity to argue the substance of the instruction to the jury).

[12] For this reason, we need not decide whether the requested instruction is a correct statement of the law, a matter about which there is some doubt. For example, the request indicated that SLI had an absolute obligation to honor the "put" and purchase the stock regardless of other circumstances. However, it is at least arguable that SLI's inside information of the material merger potential is a circumstance mitigating any such obligation. See 26 C.F.R. § 54.4975-7(b)(12)(ii) (providing that "[t]he period during which a put option is exercisable does not include any time when a [participant] is unable to exercise it because the party bound by the put option is prohibited from honoring it by applicable Federal or state law"). Further, it is at least arguable that SLI could have avoided any repurchase obligation by disclosing to Finnerty in

26

2. *SLI's remaining arguments.*

There is little merit to SLI's remaining contentions.  We reject summarily its challenge to the district court's instruction on scienter.  If an instruction accurately reflects the law, the district court is "afforded wide discretion as to the style and wording employed"; we will reverse only "where we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, 739 F.3d 579, 585 (11th Cir. 2013) (internal quotation marks omitted).  SLI does not argue that the district court's scienter instruction misstated the law.  Rather, SLI argues that the instruction could have been read by jurors as setting forth alternative definitions of scienter: one requiring intent to "deceive, manipulate, or defraud," and the other improperly requiring only "kn[owledge] of the existence of material facts that were not disclosed."  But SLI's own counsel made it clear to the jury that

confidence and giving him the opportunity to withdraw through mutual rescission of the "put" election.  Cf. Smith, 891 F.2d at 1574; Jordan, 815 F.2d at 431.  Finally, it is at least arguable that the requested instruction is misleading because it suggests an absolute obligation to buy the stock; we think such an obligation is at least arguably qualified by the fact that SLI could have declared a "blackout" and thereby prevented the distribution of stock to Finnerty, thus also preventing the occurrence of Finnerty's "put."  For these reasons, there is at least some doubt about whether SLI's requested instruction would be misleading.

Both our decision and the fact that SLI in this case actually had the required thirty days to notify with respect to a "blackout," see supra note 11, make it unnecessary for us to decide whether SLI's inside information means that the "blackout" thirty-day notice requirement is inapplicable under 29 U.S.C. § 1021(i)(7)(B)(i) (excepting from the definition of "blackout" a suspension of distributions which occur "by reason of the application of the securities laws").

27

the instruction described two different kinds of securities fraud—a misrepresentation and an omission—and that "[b]oth of those things must be done with an intent to deceive, manipulate, or defraud." Under these circumstances, we are not left with "a substantial and ineradicable doubt" as to whether the instruction failed to require a finding of a mental state embracing intent to deceive, manipulate, or defraud. Id. (internal quotation marks omitted).[13]

SLI's argument that the district court erred in rejecting its proposed instruction that "[a] person who believes that his alleged misrepresentation or omission is in the corporation's best interests does not have the requisite state of mind, or scienter, to violate Section 10(b)" is equally meritless. SLI relies on United States v. D'Amato, which holds that "[m]ail fraud cannot be charged against a corporate agent who in good faith believes that his or her (otherwise legal) misleading or inaccurate conduct is in the [victim] corporation's best interests." 39 F.3d 1249, 1257 (2d Cir. 1994). D'Amato is inapposite here. The context in D'Amato was that the alleged wrongdoer believed in good faith that his

---

[13] Moreover, even if the jury instruction could be read as setting forth alternative definitions of scienter, as SLI urges, our conclusion would not change because the purported alternative definition that SLI challenges accurately conveyed the law. The relevant phrase provided: "knew of the existence of material facts that were not disclosed although the Defendant knew that knowledge of those facts would be necessary to make the Defendant's other statements not misleading." Jury Instructions at 12–13 (emphasis added). This is consistent with our cases holding that the scienter requirement of Rule 10b-5 may be satisfied by a showing that the defendant's conduct was "an extreme departure from the standards of ordinary care" and "present[ed] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008) (internal quotation marks omitted).

28

actions were in the best interest of the alleged victim.  By contrast, in this case, the

"corporation's best interests" are not at all aligned with the interests of the victim

plaintiff.

### III.    Conclusion.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.[14]

---

[14] We deem SLI's appeal of the costs award waived because SLI "failed to develop the argument or to offer any citation to the record in support of it." Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1283 (11th Cir. 2009).

Appellants' motion to strike the amicus curiae brief filed by the Securities and Exchange Commission, which was carried with the case, is denied.