[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-11070

_____

DUSTIN C. BRINK,

Plaintiff-Appellant,

*versus*

DIRECT GENERAL INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-02844-JSM-AEP

_____

Before JILL PRYOR, GRANT, and ANDERSON, Circuit Judges.

GRANT, Circuit Judge:

Dustin Brink was seriously injured in an automobile accident and won over $12 million in a suit against the other driver. To recover the judgment, Brink sued that driver's insurance company on the theory that it acted in bad faith toward its insureds. The jury returned a verdict in the insurer's favor, but Brink argues that the district court abused its discretion by failing to give his proposed jury instruction.

We agree. The district court instructed the jury on bad faith resulting from the failure to settle a claim. But Florida law provides—and Brink argued at trial—that bad faith is also present when an insurance company fails to *advise* an insured about settlement offers and likely litigation outcomes. Because the district court's instruction omitted the state law relevant to this theory of liability, we reverse.

## I.

Fourteen years ago, Brink was riding a motorcycle when he collided with a car. He was airlifted to a hospital and lay in a coma for several weeks. The other driver, Juan Ruiz Pereles, was covered by a policy issued by Direct General Insurance. Direct General learned about the accident three weeks later and promptly interviewed both Pereles and his father (the policyholder). When those interviews revealed that Brink had hired a lawyer, Direct General immediately faxed a letter to Brink's counsel. But from there, communication sputtered. Despite several attempts, Direct

General failed to reach Pereles and his father. And because Brink's lawyer quit representing him, it struggled to contact Brink as well.

Four months after the accident, Direct General sent letters to the policyholder explaining its bodily injury policy—$10,000 per person with a $20,000 cap per accident—and asking about any other insurance coverage that might apply. But perhaps wearied by the struggle to actually reach its insureds, Direct General decided to simply pay the policy limit for the accident. A few days later, it attempted to contact Brink's new attorney, Alexander Clem.

Clem also proved a difficult person to reach. After two months of futile efforts, Direct General sent a pointed letter to Clem in which it listed 11 previous attempts at contact, offered to tender the "bodily injury policy limits of $10,000 to settle" Brink's claim, and enclosed a check for $10,000. The check was never cashed, and Direct General heard nothing for seven more months.

Fourteen months after the original accident, Clem broke the silence with a letter. He informed Direct General that he needed more information verifying the total coverage available to Pereles and his father. Direct General offered him an affidavit of coverage stating that it knew of no other insurer, but this did not satisfy Clem. Direct General continued to push for a settlement, but Clem was not responsive.

After another eight months, on February 19, 2010, Clem finally replied to Direct General. He again asked about other insurance coverage and insisted that any settlement release allow Brink to recover uninsured motorist and medical payment claims.

But this time, Clem indicated that a final settlement was possible. He concluded his letter with a promise: "If I receive that release and the requested insurance disclosure documentation in the next couple of weeks with all insurance proceeds offered by your company, then my client will sign the release. Of course, this is an offer for a unilateral contract, requiring that I receive these items rather than a promise."

The settlement opportunity that Direct General had sought for almost two years had finally arrived—but two weeks came and went, and Clem heard nothing. No evidence suggests that Pereles or his father were informed of the offer during this time. After the third week, Clem sent a letter explaining that Brink was suing Pereles and his father because Direct General had ignored his offer. "For some reason, I have still never received a response to my letter of February 19, 2010, after Direct General had called and written to me dozens of times over the history of this claim," he wrote (with no comment on his own responsiveness). "Now, for some reason, when I presented a time-limited settlement offer, Direct General did not respond at all. . . . If you feel inclined to provide an explanation for this, I would be very interested in hearing it sometime next week."

Direct General finally wrote back after two more weeks, expressing a hope that a settlement would soon be "finalized." But under the terms of Clem's February 19 offer, Direct General was too late. Clem rejected Direct General's attempts to settle and, as he had promised, proceeded with a lawsuit against its insureds. Brink won $12,679,837.17 at the end of the ensuing jury trial.

All that is prelude to the case before us.  Six years after the previous trial, Brink filed suit again—this time against Direct General for breach of fiduciary duty (that is, bad faith) toward its insureds.[1]  Prevailing in this lawsuit would mean that Brink could collect his $12.6 million judgment from Direct General.

At the close of discovery the district court denied summary judgment to Direct General, explaining that Brink had offered "sufficient evidence from which a reasonable jury may find Direct General failed to act in good faith as required under Florida law." In the court's view, the evidence supported a possible finding that "Direct General failed to timely respond" to a settlement offer and "failed to advise its insureds of the February 19, 2010 settlement opportunity."  The court also believed that the evidence supported Brink's argument that "Direct General failed to inform its insureds of the possibility of an excess judgment until March 2010, nearly two years after the accident."

Once again, the case proceeded to trial.  Brink produced an expert witness who testified that "Direct General failed to comply with the industry custom and practice" normally followed by insurance companies in at least two ways: by failing to settle the claim, and by failing to communicate with and advise its insureds.

---

[1] Under Florida law, "a judgment creditor may maintain suit directly against [a] tortfeasor's liability insurer for recovery of the judgment in excess of the policy limits, based upon the alleged fraud or bad faith of the insurer in the conduct or handling of the suit." *Thompson v. Com. Union Ins. Co. of N.Y.*, 250 So. 2d 259, 264 (Fla. 1971).

In response, Direct General argued that undisputed evidence showed that it had "made over 50 attempts to communicate with Mr. Clem by telephone and letter to try to settle" and that it had fulfilled its obligation to keep Pereles and his father informed throughout the process.

At the end of the trial, Brink requested a specific jury instruction on the definition of bad faith that covered both theories of liability he presented—failure to settle and failure to advise:

> Juan Ruiz Pereles and Juan Ruiz De Los Santos were insured against the claim made by Dustin Brink arising from the April 5, 2008 accident under a policy of insurance issued by Direct General Insurance Company.

> Direct General's insureds surrendered to Direct General control over the handling of the claim and settlement decisions. Direct General owed a fiduciary duty of good faith to act in its insureds' best interests and protect its insureds from judgments in excess of their policy limits. In handling the claim against its insureds, Direct General had a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.

> The duty of good faith required Direct General to advise its insureds of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insureds of any steps they might take to

> avoid an excess judgment. Direct General was further required to investigate the facts, give fair consideration to a settlement offer that was not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.
>
> The focus in this bad faith case is not on the actions of Dustin Brink or his attorneys, but rather on the actions of Direct General and its obligation to act in good faith toward its insureds. The critical inquiry is whether Direct General diligently, and with the same haste and precision as if it were in its insureds' shoes, worked on the insureds' behalf to avoid an excess judgment. The absence of good faith constitutes bad faith.

Brink argued that this instruction, which was heavily footnoted with Florida precedents, correctly stated Florida's law on bad faith, as explained by the state high court in *Boston Old Colony Insurance Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980), and subsequent cases. But the district court chose instead to give a standard jury instruction addressing only liability for failure to settle:

> Bad faith on the part of an insurance company is failing to settle a claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for their interests.

8                        Opinion of the Court                    21-11070

*See In re Standard Jury Instructions in Civ. Cases*, 35 So. 3d 666, 720–21 (Fla. 2010).

During deliberations, the jury asked the following question: "Is bad faith based on the full length of time from the accident or on the time from [the] February 19, 2010 letter?" Although Brink urged the district court to respond that the jury had already been instructed on the law, the court instead responded, "In determining bad faith on the part of an insurance company, you should consider the totality of the circumstances."

The jury returned a verdict for Direct General. Brink now appeals.

## II.

We review a district court's refusal to give a requested jury instruction and its response to a jury question during deliberations for an abuse of discretion. *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013); *United States v. Joyner*, 882 F.3d 1369, 1375 (11th Cir. 2018). In either case, we reverse only when a court's jury instructions leave us "with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Broaddus v. Florida Power Corp.*, 145 F.3d 1283, 1288 (11th Cir. 1998) (quotation omitted).

## III.

Brink argues that the district court erred in two ways: by failing to give his proposed jury instruction on bad faith, and by giving a deficient answer to the jury's question during deliberations. The district court did not abuse its discretion in

answering the jury's question.  But because the jury was not instructed on a failure-to-advise theory of bad faith, the court's refusal to use Brink's proposed instruction requires us to reverse.

## A.

We begin with Brink's proposed jury instruction.  A refusal to give a requested jury instruction amounts to an abuse of discretion when "(1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party."  *Lamonica*, 711 F.3d at 1309 (quotation omitted).  Each requirement is met here.

*First*, Brink's requested instruction correctly stated applicable Florida law.  Each statement of law in the proposed instruction is supported by binding Florida precedent.[2]  In *Boston Old Colony*, the Florida Supreme Court explained that an insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business."  386 So. 2d at 785.  The court further clarified that the "good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment,

---

[2] The dissent asserts that the district court had "no duty to parse" Brink's proposed instructions and "save whatever portions thereof that might be correct."  We do not suggest otherwise.  Because the complete instruction correctly states Florida law, we need not consider whether any portion of the instructions can be considered separately on appeal.

and to advise the insured of any steps he might take to avoid same," and that the "insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.*; *see also Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6–8 (Fla. 2018). The beginning paragraphs of Brink's proposed instruction reproduce the Florida Supreme Court's language in *Boston Old Colony* almost verbatim.

Direct General concedes that "most of the individual sentences in the instruction do, on a strictly technical basis, correctly state the law." The problem, Direct General says, is that one sentence misstates the law: "The focus in this bad faith case is not on the actions of Dustin Brink or his attorneys, but rather on the actions of Direct General and its obligation to act in good faith toward its insureds." In Direct General's view, that statement invalidates the instruction because, contrary to Florida law, it does not allow the jury to consider the responsiveness of Brink's attorney as part of the "totality of the circumstances."

That argument does not hold water. The contested sentence is also drawn directly from binding Florida precedent. As the Florida Supreme Court has explained multiple times, the "focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Harvey*, 259 So. 3d at 10 (quoting *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 677 (Fla. 2004)). And this Court recently reemphasized that in Florida bad faith suits, the focus must remain on the actions

of the insurer. There is a "difference," we said, "between *focusing* on a claimant's actions, which would be improper, and *factoring* a claimant's actions into the totality of the circumstances analysis, which is not improper." *Pelaez v. GEICO*, 13 F.4th 1243, 1253–54 (11th Cir. 2021). Brink's proposed instruction carefully observed that difference, and the dissent points to no language in the instruction that violates the principle we explained in *Pelaez*.

The responsiveness (or lack thereof) of Brink's attorney was not exemplary, and the jury was allowed to consider his actions as part of the totality of the circumstances. But his actions were not the focus of the case. The proposed instruction properly kept the focus away from the actions of Brink's attorney while still allowing the jury to consider them.

*Second*, Brink's proposed instruction dealt with an issue properly before the jury: bad faith for failure to advise. Under Florida law, "it is for the jury to decide whether the insurer failed to act in good faith with due regard for the interests of the insured." *Harvey*, 259 So. 3d at 7 (quotation omitted). And the question of bad faith was the central issue of Brink's lawsuit.

Furthermore, Brink's theory of bad faith based on a failure to advise was fully presented at each stage of the case. The complaint asserted liability for both "failing to settle Plaintiff's claims against the insureds" and "failing to fully, honestly and promptly advise the insureds." When the district court denied summary judgment to Direct General, it explicitly recognized that a jury could hold Direct General liable because it failed to advise Pereles and his father. Brink's expert witness testified that Direct

General failed to comply with its legal duties to "notify [its] insured of a settlement opportunity," to "advise him on the steps he can take to protect himself," to "advise him of the nature of the injuries and likelihood of an excess verdict," and to "correspond with him in a meaningful way." And at closing argument, Brink argued that "[o]ne of the easiest ways to invite a bad faith claim is to fail to keep the insured advised of settlement opportunities."

Direct General does not dispute that Brink argued both failure-to-settle and failure-to-advise bases for liability. It was therefore proper for the jury to consider both theories.

*Third*, the district court's failure to give Brink's proposed instruction caused prejudicial harm. Prejudice results when a district court's failure to give a jury instruction creates a "misimpression that require[s] a correction"—that is, when it has an "effect on the verdict." *Finnerty v. Stiefel Lab'ys, Inc.*, 756 F.3d 1310, 1324 (11th Cir. 2014). The standard bad-faith instruction adopted by the court here created such a misimpression because it limited the basis for bad faith to a failure to settle. Indeed, it was designed to cover only that issue—contrary to the dissent's assertion that it also "fairly encompassed the *Boston Old Colony* duties." The instruction was entitled "Insurer's Bad Faith (Failure to Settle)," and the drafting committee warned that "[o]ther instructions may be necessary if liability is asserted for the insurance company's violation of some other duty" than the duty to settle. *In re Standard Jury Instructions*, 35 So. 3d at 720–21. That warning was explicitly accompanied by a reference to *Boston Old*

*Colony*'s "duty 'to advise.'" *Id.* at 721 (quoting *Boston Old Colony*, 386 So. 2d at 785).

To be clear, we do not—as the dissent suggests—"believe that the duty to advise the insured is an independent theory of liability" separate from the duty of good faith. But *Boston Old Colony* and its progeny hold that bad-faith liability may be triggered in several distinct ways, and the jury instruction given by the court described only one: failure to settle.

As explained above, Brink repeatedly asserted that Direct General had violated its duty to advise its insureds. But the jury was never instructed that it could find liability on that basis, and in this Circuit a "jury is presumed to follow jury instructions." *Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983). We therefore conclude that the district court abused its discretion when it failed to give Brink's requested instruction.[3]

Direct General urges us to consider the district court's error as harmless because "the jury *was* informed" of an insurer's obligations beyond the duty to settle "and expressly told that they constituted a basis for bad faith." By whom? Brink's counsel, who "argued what he felt were the applicable obligations during closing

_____

[3] In his initial brief (but not at oral argument), Brink also argued that because the jury was instructed "without any guidance on what it means to act with 'due regard' for the interests of the insured," the jury instructions were per se deficient. That argument goes too far. As we understand Florida law governing bad faith, "due regard" is a commonsense standard, not a term of art encompassing particular elements, and Brink has pointed us to no Florida authority to the contrary.

14                    Opinion of the Court                    21-11070

argument," and his expert, who "went through an insurer's good-faith obligations during his testimony." In the end, the insurer argues, the "jury was hardly left in the dark as to what Direct General's good-faith obligations were," despite the district court's failure to fully explain them.

This argument ignores the fundamental difference between counsel and the court. A lawyer advocates for her client's best interest (and usually against the interests of adversarial parties). The court, in contrast, is a neutral arbiter responsible for upholding the rule of law. When the jury makes its findings, it must rely on the law as stated by the court, not the law as construed in various—often conflicting—ways by attorneys throughout the trial. That is why "we look to the words of the trial court, not defense counsel, in determining if jury instructions are adequate," and why "we cannot depend on defense counsel's closing argument to save the Judge from error." *See United States v. Wolfson*, 573 F.2d 216, 221 (5th Cir. 1978);[4] Fed. R. Civ. P. 51. The dissent protests that we are permitted to "consider what the parties' counsel and expert witnesses said to the jury" when reviewing jury instructions. And so we are—to a point. The record provides vital context and background when we review jury instructions. But an attorney's closing argument or an expert's testimony, no matter how accurate, is no substitute for an instruction issued by the court.

_____

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

While the district court's error requires us to reverse the verdict below, our holding is limited in scope. We are mindful that the "obligations set forth in *Boston Old Colony* are not a mere checklist" for bad-faith lawsuits and do not suggest that jury instructions must treat them as such. *Harvey*, 259 So. 3d at 7. Not every bad-faith jury instruction need be as detailed and expansive as the one Brink proposed. And—of course—we express no view on the merits of Brink's argument that Direct General acted in bad faith by failing to advise its insureds. All we hold is that when a party properly argues a theory of liability grounded in state law, a district court abuses its discretion if it causes prejudice by failing to instruct the jury on that theory.

## B.

Brink also argues that the district court abused its discretion by telling the jury that it should consider the "totality of the circumstances" when asked whether the bad faith claim encompassed the full length of time after the accident or only the time after Brink's attorney Clem sent the settlement offer. The court's answer was no abuse of discretion; it was a correct statement of Florida law.

As the Florida Supreme Court explained in *Berges v. Infinity Insurance Co.*, "the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." 896 So. 2d at 680 (citing *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 63 (Fla. 1995)); *see also Harvey*, 259 So. 3d at 7. The insurer's "entire conduct in the handling of the claim" is relevant. *Berges*, 896 So.

2d at 672.  Brink concedes that the totality-of-the-circumstances standard is correct.  But he argues that the district court's answer wrongly "implie[d]" that the jury should look beyond the most relevant time frame—the two-week period immediately after Clem sent the February 2010 letter.

That argument does not persuade us.  At bottom, Brink suggests that the jury was misled by instructions that merely failed to emphasize the time period most favorable to his claim.  No doubt Brink had good reason to draw the jury's attention away from the many months during which his attorney failed to respond to Direct General's inquiries.  But the totality-of-the-circumstances standard did not cease to govern the jury's deliberations simply because only *some* circumstances reflected well on Brink.

Brink offers no authority to suggest that the district court's answer was an incorrect statement of Florida law—and he cannot, because it is not.  The answer was thus not an abuse of discretion.

⋆    ⋆    ⋆

Brink's proposed jury instruction correctly stated the legal basis for his failure-to-advise theory of liability, and the district court's failure to give that instruction to the jury caused him prejudice.  We therefore **REVERSE** the district court's judgment and **REMAND** for a new trial.

21-11070  ANDERSON, J., Concurring in part & dissenting in part    1

ANDERSON, Circuit Judge, concurring in part & dissenting in part:

I concur in Part III.B. of the opinion for the Court; I agree with the majority that the district court's answer to the jury's question was a correct statement of Florida law.  However, I respectfully dissent from the majority's decisions in Part III.A.  For the reasons discussed below, I respectfully submit that Brink has failed both the first and the third prongs of our abuse of discretion standard of review applicable to an asserted failure to give a requested jury instruction.  *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013).

Appellant Dustin Brink ("Brink") is appealing a jury verdict in favor of Appellee Direct General Insurance Co. ("Direct General").  In September 2013, Brink obtained a final judgment against two of Direct General's insureds for roughly $12 million and $600,000, respectively.  In 2019, he sought to recover this judgment from Direct General, alleging that it had acted in bad faith by breaching fiduciary duties it owed to the insureds.  His bad faith claim proceeded to trial, where the jury found that Direct General had not acted in bad faith in failing to settle Brink's claims against the insureds.

Brink has appealed that jury verdict on two grounds.  First, he argues that the trial court committed reversible error by refusing to give his requested jury instruction on what constitutes "bad faith" by an insurance company.  Second, he argues that the court gave an erroneous and misleading supplemental instruction in response to a question from the jury during its deliberations.  Our

2  ANDERSON, J., Concurring in part & dissenting in part    21-11070

precedent dictates that this Court will only reverse a jury verdict and order a new trial if we harbor a substantial and ineradicable doubt as to whether the jury was properly instructed.  Because I have no such doubt, I would affirm.

## I.

These are the relevant facts as I see them.  On April 5, 2008, a car driven by one of Direct General's insureds collided with Brink, who was riding his motorcycle.  Brink sustained serious bodily injuries.  At that time, the driver and the owner of the car were insured by Direct General against liability arising out of operation of the car.  This liability insurance policy had a $10,000 per person limit for bodily injury claims and a $10,000 per accident limit for property damage claims.  Brink himself had uninsured motorist insurance with a separate insurance company that provided up to $75,000 in coverage.

On April 28, 2008, Direct General learned of the accident and took statements from the insureds.  On July 3, 2008, Brink entered a contingency fee agreement with two law firms—the firm who represented him in the underlying action against the insureds and the firm who represented him in this bad faith action.  This fee agreement said, "For any recovery up to $85,000.00, there is NO fee."  For any recovery "greater than $85,000.00," the two law firms

21-11070  ANDERSON, J., Concurring in part & dissenting in part    3

would collectively receive 40% of the "gross recovery."[1]  On July 17, 2008, Direct General decided to cover the accident due to the seriousness of Brink's injuries and the sworn statements from the insureds.

On August 4, 2008, Alexander Clem ("Clem"), Brink's lawyer in the underlying action, sent Direct General a letter stating that Clem's firm was representing Brink and requesting that Direct General provide him insurance information as required by Florida law.  Fla. Stat. § 627.4137.

On August 18, 2008, Direct General sent the insured car owner two letters.  One letter outlined the policy's limits and warned him that he would be liable for any judgment in excess of those limits if Direct General could not settle Brink's claim.  The second letter notified him of Clem's request for information and asked him to provide Clem "the name and coverage of any other known insurance" he had.  This letter also warned him that "[f]ailing to promptly provide [Clem] with information regarding any other insurance . . . may affect the ability to settle this case and may prevent a settlement."  Direct General sent both letters to the wrong address.

That same day, Direct General responded to Clem's initial letter.  It confirmed that it received Clem's letter and enclosed (i) a

---

[1] Note that this $85,000 figure is the sum of the insureds' $10,000 bodily injury coverage limit and Brink's $75,000 uninsured motorist coverage limit.

4  ANDERSON, J., Concurring in part & dissenting in part    21-11070

copy of its letters to the insured car owner, (ii) an affidavit from its superintendent with the requested information,[2] and (iii) a copy of the policy it issued to the insured car owner.  On August 22, 2008, it sent Clem a letter requesting that he provide medical records to verify the severity of Brink's injuries.  Between August 22 and October 20, Direct General called and left voicemails for Clem 8 times concerning Brink's bodily injury and property damage claims.

On October 21, 2008, Direct General sent a letter to Clem stating that it was "extending an offer to tender [its] policy limits of $10,000.00 to [Brink] . . . as settlement of the . . . bodily injury claim."  On October 28 and November 18, 2008, Direct General left Clem a total of 4 voicemail messages.  There was no response.  On November 18, it sent him another letter following up on its offer to tender the policy limit.  On November 20, 2008, Direct General left another 2 voicemail messages for Clem and his paralegal.  On November 20, 2008, Direct General sent Clem another letter along with a check for the $10,000 policy limit and a proposed release for Clem's consideration.  There was no response to any of these efforts.

---

[2] The superintendent's affidavit provided the information required by Florida law.  Fla. Stat. § 627.4137(1)(a)–(e).  It stated the insurer's name, the insured's name, and the policy limits.  It answered "None" to the following prompt: "A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer at the time of filing such statement."  *Id.* § 627.4137(1)(d).  It also said that Direct General "does not know of any other insurer for its insured."

21-11070  ANDERSON, J., Concurring in part & dissenting in part    5

On November 25, 2008, Direct General emailed Clem about Brink's property damage claim.  Between December 8, 2008, and January 6, 2009, Direct General called Clem's office 5 times and either left a voicemail or spoke with his paralegal.  Direct General's adjuster for Brink's property damage claim sent Clem 3 more letters on January 29, February 16, and March 12, 2009 requesting the location Brink's motorcycle.  Between February 9 and May 27, 2009, Direct General called and left Clem, or his paralegal, another 6 voicemail messages.  There was no response to Direct General's letters and voicemail messages.[3]

On June 26, 2009, Clem finally responded in a letter to Direct General's bodily injury and property damage claims adjusters.  After requesting that Direct General pay for the towing of Brink's motorcycle, Clem said,

> [P]lease go ahead and supplement your response to my request for the disclosure of insurance information.  It has been a long time since my letter to you and I still do not have all the requested information in order to verify the amount of liability coverage available to your insureds. . . .

---

[3] Brink concedes that "[f]rom August 19, 2008, through June 25, 2009, Direct General attempted to contact Clem regarding the bodily injury claim via phone call and letter approximately 18 times, with no record of a response from Clem."  Based on my count, that number jumps to 25 times if you include Direct General's attempts to contact Clem regarding Brink's property damage claim.

6  ANDERSON, J., Concurring in part & dissenting in part    21-11070

Clem did not specify what information he still needed, and he did not mention the $10,000 check that Direct General had sent the previous November.

On July 2, 2009, Clem sent a letter to the property damage claims adjuster with a copy of the towing bill; he did not mention Brink's bodily injury claim. That adjuster responded on July 17 requesting the location of Brink's motorcycle so it could inspect the motorcycle and provide an estimate.

On July 30, 2009, Direct General responded to Clem's letter from June 26, 2009. Direct General attached the same information it had provided Clem in response to his letter from August 4, 2008: the affidavit from Direct General's superintendent and a copy of its policy with the insured car owner. It also offered to settle Brink's property damage claim, including the cost of the towing bill.

On January 18, 2010, Direct General sent Clem a re-issued $10,000 check for Brink's bodily injury claim and a proposed release for that claim. It also called and left Clem voicemail messages concerning that claim on January 27, February 3, and February 11.

On February 19, 2010, Clem sent a letter to Direct General which read as follows:

> Dear Ms. Moore:
>
> Thank you for your telephone message last week. I also received your letter dated January 18, 2010, with the enclosed $10,000.00 check made payable to

21-11070   ANDERSON, J., Concurring in part & dissenting in part   7

"Morgan and Morgan P.A. Trust Account on behalf of Dustin Brink" and a proposed bodily injury release.

I have recently been in communication with Mr. Brink's insurance company about resolving his claims for uninsured motorist and medical payments coverage benefits. As you may know, those claims for first-party benefits are under several Mississippi policies issued by an insurance company out of Missouri, so it may take some time to work them out. Be that as it may, my client is now ready to resolve his claims against your insured for the amounts proposed by your company for the claims being released if the conditions for settlement are met.

Of course, we previously sent your company a request for information pursuant to 627.4137 of the Florida Statutes, including the statement of your insured or his insurance agent, in order to verify the amount of available liability insurance. I have statements from your company's superintendent and copies of your personal auto policy and declarations page. But even after all this time, I still have not received the disclosure statement from your insured or his insurance agent.

Naturally, we need a complete set of your company's information under 627.4137 Florida Statutes before our client can settle, and a statement from your insured, if possible, so please send that to me at your earliest convenience. If for some reason your insured's statement is not available, please verify of [*sic*]

8  ANDERSON, J., Concurring in part & dissenting in part    21-11070

all of your company's efforts to obtain it by sending me copies of all of your company's letters to your insured requesting that he provide the statement required under 627.4137 of the Florida Statutes.

As far as my client's uninsured motorist and medical payments claims, we will need to have language in the release that preserves my client's rights to recover those benefits.  So please just add a clause stating that my client reserves his claims for first-party benefits to your standard release of all claims.  If I receive that release and the requested insurance disclosure documentation in the next couple of weeks with all insurance proceeds offered by your company, then my client will sign the release.  Of course, this is an offer for a unilateral contract, requiring that I receive these items rather than a promise.

You made the $10,000.00 check enclosed with your last letter payable to our firm's trust account, and that is an acceptable manner of issuing payment.

Please let me know if you need any information regarding this uninsured motorist or medical payments coverage.

Thank you for your attention to this matter.

Sincerely,

Alexander M. Clem

On March 12, 2010, Clem sent Direct General another letter stating that he had filed a lawsuit on behalf of Brink that day.  Clem said his February 19 letter was "a time limited settlement offer" to

21-11070  ANDERSON, J., Concurring in part & dissenting in part    9

which "Direct General did not respond at all." He said to settle Brink's claim, "all [Direct General] needed to do was get [him] three items in two weeks":

1)    a statement from an insured or his agent, which I have asked for in writing three times going back to August 4, 2008,

2)    your company's release of all claims simply containing a clause preserving my client's right to recover first-party benefits, and

3)    a draft for the $900 of property damage Direct General had previously offered to pay.[4]

Clem concluded that Direct General had rejected his settlement offer, and he stated that his client's offer to settle had expired.

Direct General attempted to call both insureds but was unable to reach them. On March 25, 2010, Direct General sent letters to both insureds regarding Brink's lawsuit. Direct General told the insureds that "Brink and his counsel have been unwilling to accept [the] policy limits" as settlement and that it could "reasonably be expected" that the damages in the suit would "exceed [the] available limits." It also told them that Direct General would appoint counsel for their defense and that Clem had requested that the insureds confirm that they had no other insurance available. These

---

[4] Notably, the three conditions listed in the March 12 letter do not match the conditions specified in the February 19 letter, which did not mention the $900 property damage claim.

letters did not inform the insureds of Brink's settlement offer from the February 19 letter.

Direct General and Clem never reached a settlement. Brink's bodily injury claim proceeded to a jury trial in March 2013. He won a final judgment of $12 million against the insured car driver and $600,000 against the insured car owner. In 2019, Brink filed his bad faith claim against Direct General in state court, and Direct General removed the action to federal court. After the district court denied Direct General's motion for summary judgment, Brink's bad faith claim proceeded to a jury trial.

The parties filed joint proposed jury instructions, and they agreed that the court should give Florida's standard jury instruction on an "Insurer's Bad Faith (Failure to Settle)." Brink proposed a nine-sentence, special instruction on the "Duties of a Liability Insurance Company Regarding Settlement":

> Juan Ruiz Pereles and Juan Ruiz De Los Santos were insured against the claim made by Dustin Brink arising from the April 5, 2008 accident under a policy of insurance issued by Direct General Insurance Company.

> Direct General's insureds surrendered to Direct General control over the handling of the claim and settlement decisions. Direct General owed a fiduciary duty of good faith to act in its insureds' best interests and protect its insureds from judgments in excess of their policy limits. In handling the claim against its insureds, Direct General had a duty to use the same

21-11070  ANDERSON, J., Concurring in part & dissenting in part  11

> degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.
>
> The duty of good faith required Direct General to advise its insureds of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insureds of any steps they might take to avoid an excess judgment. Direct General was further required to investigate the facts, give fair consideration to a settlement offer that was not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.
>
> The focus in this bad faith case is not on the actions of Dustin Brink or his attorneys, but rather on the actions of Direct General and its obligation to act in good faith toward its insureds. The critical inquiry is whether Direct General diligently, and with the same haste and precision as if it were in its insureds' shoes, worked on the insureds' behalf to avoid an excess judgment. The absence of good faith constitutes bad faith.

Direct General objected to this proposed special instruction as "improper because [Brink] ha[d] hand-picked select statements of Florida law which either [did] not apply to this case, [were] misstated and/or [did] not present a complete picture of Florida law on bad faith." Specifically, it argued that the seventh and ninth sentences of the proposed instruction were inaccurate or misleading.

12  ANDERSON, J., Concurring in part & dissenting in part  21-11070

Brink's trial counsel noted to the district court that Direct General had not specifically objected to "anything that's contained in the first one, two, three paragraphs of the proposed instruction" and had objected only to two sentences in the fourth paragraph of the proposed instruction. Defense counsel responded that the proposed instruction, as a whole, "just cherry picked select statements from various cases" and "doesn't give an accurate reflection of" Florida bad faith law. The district judge denied the proposed instruction and opted instead "to give the Florida Standard Instructions."

At trial, Brink offered expert witness testimony from Daniel Doucette ("Doucette"). Doucette testified that "Direct General failed to comply with the industry custom and practice" in several ways. First, it failed to settle Brink's claim when it "could and should" have done so—*i.e.*, after Brink's attorney offered to settle the claim in the February 19 letter. He said the February 19 letter "triggered" "two primary duties" that Direct General failed to satisfy: (i) "[t]o try to meet the demand and resolve the case and protect their insured" and (ii) "to immediately notify the insured that there's an opportunity to settle in front of them." He noted that Direct General had failed to communicate with its insureds once it received the February 19 letter.

During closing arguments, Brink's counsel made several statements about Direct General's duty to its insureds and what constitutes bad faith:

21-11070  ANDERSON, J., concurring in part & dissenting in part  13

- [Direct General has] got to treat their insured customers the same way as if it had been them who was exposed to this $12 million claim.  In other words, if Direct General itself had the chance to accept the February 19, 2010 settlement offer to save itself from a $12 million liability for only $10,000, it's got to use that same level of effort to protect its insureds.  That's what good faith requires.

- [W]hen we're talking about insurance companies, bad faith is simply failing to settle a claim when under all the circumstances it could and should have done so had it acted fairly and honestly and with due regard for their insured's interest.

- What's our claim?  Our claim is that after February 19, 2010, Direct General failed to settle when under all the circumstances it could and should have done so had it acted fairly and honestly towards its insureds and with due regard for their interest.  It's up to you to decide whether we met that burden of proof.

- One cannot pay due regard to another if they pay no attention to their situation.  [The insureds] needed attention paid to settlement offers that might be made in their case and they simply didn't get it from Direct General.  It's been . . . essentially undisputed it was not responded to.  It did not get any attention.

14  ANDERSON, J., concurring in part & dissenting in part  21-11070

- Here they failed to pay attention to the time lim-
  ited settlement offer and that's failure of due re-
  gard.

- One of the easiest ways to invite a bad faith claim
  is to fail to keep the insured advised of settlement
  opportunities or fail to document that such advice
  was given.  Documentation is key.

After closing arguments, the district court gave the follow-
ing instruction for an insurer's bad faith failure to settle: "Bad faith
on the part of an insurance company is failing to settle a claim
when, under all the circumstances, it could and should have done
so, had it acted fairly and honestly toward its insured and with due
regard for their interests."

During deliberations, the jury asked the court a question: "Is
bad faith based on the full length of time from the accident or on
the time from February 19, 2010 letter?"  Brink wanted the court to
respond that the jury had already been instructed in the law, but
defense counsel said "the answer . . . is, 'totality of the circum-
stances.'"  Brink disagreed because his claim was that Direct Gen-
eral "acted in bad faith after February 19th.  So to say that, 'the
totality of the circumstances,' you are telling them the answer is
something else."  Brink's counsel worried that by giving the "total-
ity of the circumstances" answer "in isolation," the court would be
"implying that . . . [Brink's claim was] not based on February 19th,
but instead based on a larger time period, which is not [his] claim."
The court noted this objection and gave the jury the following

21-11070  ANDERSON, J., concurring in part & dissenting in part  15

written answer: "In determining bad faith on the part of an insurance company, you should consider the totality of the circumstances."

The jury returned from deliberations 5 minutes after receiving the court's answer.  The verdict form asked the jury, "Did [Direct General] act in bad faith in failing to settle the claims against [the insureds]?" and the jury answered, "No."

## II.

On appeal, Brink argues that the district court committed reversible error by (i) refusing to give his proposed special jury instruction on what constitutes "bad faith" by an insurance company and (ii) giving an erroneous and misleading supplemental instruction in response to the jury's question during its deliberations.  This Court reviews both actions by the district court for abuse of discretion.  *United States v. Joyner*, 882 F.3d 1369, 1375 (11th Cir. 2018).

A district court's refusal to give a proposed jury instruction is an abuse of discretion "only when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party."  *Lamonica*, 711 F.3d at 1309 (quoting *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1333–34 (11th Cir. 2011)).  When evaluating the first prong—*i.e.*, whether the instruction misstates, or misleadingly states, the law—we review the instruction *de novo*.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1276 (11th Cir. 2008).

16    ANDERSON, J., concurring in part & dissenting in part    21-11070

"The substance of jury instructions in diversity cases is governed by the applicable state law, but questions regarding procedural aspects of jury charges are controlled by federal law and federal rules." *Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074, 1081–82 (11th Cir. 1987). Whether a district court's refusal to give a proposed jury instruction "necessitate[s] a new trial is a procedural matter governed by federal law." *Id.* at 1082; *see also Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 750 F.2d 1516, 1525 (11th Cir. 1985) ("The granting or denial of jury instructions in diversity cases is controlled by federal laws and federal rules while the substance of those instructions is governed by the applicable state law . . . ." (citation omitted)).

Our standard of review is "deferential." *Bearint ex rel. Bearint v. Dorell Juv. Grp., Inc.*, 389 F.3d 1339, 1351 (11th Cir. 2004). Our "role" when "reviewing a trial court's jury instructions[] is to assure 'that the instructions show no tendency to confuse or to mislead the jury with respect to the applicable principles of law.'" *Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 979 F.2d 823, 824 (11th Cir. 1992) (quoting *Rohner, Gehrig & Co. v. Cap. City Bank*, 655 F.2d 571, 580 (5th Cir. Unit B Sept. 1981)). Accordingly, "[i]f the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instruction." *Bearint*, 389 F.3d at 1351. "We will reverse and order a new trial only when we are 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1215

21-11070  ANDERSON, J., Concurring in part & dissenting in part  17

(11th Cir. 2021) (quoting *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1288 (11th Cir. 1998)).

### III.

I think Brink's challenge to the district court's failure to give his requested jury instruction must fail at either the first or third prong of this Court's abuse of discretion standard of review.  I first address *Lamonica*'s first prong and then address the third.

### A.

The first prong says a district court's refusal to give a proposed jury instruction may be an abuse of discretion only when the proposed instruction correctly stated the law.  *Lamonica*, 711 F.3d at 1309.  Brink's proposed instruction, considered as a whole, misleadingly stated Florida law on bad faith failure to settle.

Florida law "imposes a fiduciary obligation on an insurer to protect its insured from a judgment that exceeds the limits of the insured's policy." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 3 (Fla. 2018).  When an insurer breaches that duty by acting in bad faith when handling the claim, the judgment creditor of the insured (*i.e.*, the tort victim) may sue the insurer directly for a recovery that exceeds the insurance policy's limits.  *Thompson v. Com. Union Ins. Co. of N.Y.*, 250 So. 2d 259, 264 (Fla. 1971).  Brink's suit against Direct General is an example of these "third-party bad faith action[s]." *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 58 (Fla. 1995).

18   ANDERSON, J., Concurring in part & dissenting in part   21-11070

The Supreme Court of Florida has authorized these bad faith suits where the insurer has failed to settle the third party's claim against the insured. *Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 784 (Fla. 1980) (per curiam). In *Boston Old Colony*, the court outlined the contours of an insurer's duty of good faith: "An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* at 785. An insurer must act "in good faith and with due regard for the interests of the insured" when handling claims against the insured. *Id.* In the context of settlement negotiations,

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Id.* (citation omitted).

The Supreme Court of Florida has clarified that "[t]he obligations set forth in *Boston Old Colony* are not a mere checklist." *Harvey*, 259 So. 3d at 7. "An insurer is not absolved of liability simply because it" fulfills these specific obligations. *Id.*

21-11070  ANDERSON, J., concurring in part & dissenting in part  19

Conversely, violating one of these *Boston Old Colony* duties "does not automatically establish bad faith; it is simply one factor for the jury to consider in determining whether the insurer acted in bad faith." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). These duties are "subsumed within the duty of good faith owed by an insurer to an insured." *Id.* In lieu of the "checklist" approach, "the critical inquiry in a bad faith [case] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7. "[N]egligence is relevant to the question of good faith," *Boston Old Colony*, 386 So. 2d at 785, but it "is not the standard" for bad faith. *Harvey*, 259 So. 3d at 9.

Whether an insurer has acted in bad faith is for the jury to decide based on the totality of the circumstances. *Berges*, 896 So. 2d at 680. While the jury must consider the totality of the circumstances, "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Id.* at 677. However, this Court recently has held: "[W]e don't understand that principle to mean the actions of a claimant — or a claimant's attorney — are irrelevant. In a bad faith action there's a difference between *focusing* on a claimant's actions, which would be improper, and *factoring* a claimant's actions into the totality of the circumstances analysis, which is not improper." *Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1254 (11th Cir. 2021). Thus, the seventh sentence of Brink's proposed instruction was misleading. That sentence requested that the jury

20  ANDERSON, J., concurring in part & dissenting in part  21-11070

be instructed that the "focus in this bad faith case is not on the actions of Dustin Brink or his attorneys, but rather on the actions of Direct General." It is misleading in that it suggests that the actions of Brink's counsel are irrelevant. But we know from our *Pelaez* decision that the actions of Brink's attorney were relevant under Florida law and could properly be factored into the totality of the circumstances analysis.

Brink proposed a nine-sentence special instruction on the "Duties of a Liability Insurance Company Regarding Settlement." But, on appeal, he is defending the accuracy of only *three* of the nine sentences in his original proposed instruction. Those three sentences, which summarize the *Boston Old Colony* duties, are as follows:

> [1] In handling the claim against its insureds, Direct General had a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.

> [2] The duty of good faith required Direct General to advise its insureds of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insureds of any steps they might take to avoid an excess judgment. [3] Direct General was further required to investigate the facts, give fair consideration to a settlement offer that was not unreasonable under the facts, and settle, if possible, where a

21-11070  ANDERSON, J., Concurring in part & dissenting in part  21

reasonably prudent person, faced with the prospect of
paying the total recovery, would do so.

Federal Rule of Civil Procedure 51(c)(1) requires parties
"who object[] to . . . the failure to give an instruction" to "do so on
the record, stating distinctly the matter objected to and the grounds
for the objection." *See* 9C Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 2554 (3d ed. April 2022 Update)
("The grounds must be stated with sufficient clarity so that the trial
judge may follow and understand them if they are well taken.").
Brink did not do so.  His original proposed instruction was nine
sentences.  On appeal, he "*is only* arguing the trial court committed
reversible error by refusing" to give three of those sentences.

Brink never notified the district court that it should consider
giving those three sentences on the *Boston Old Colony* duties sep-
arately from the rest of the proposed instruction.  The closest he
came to doing so was when Brink's counsel told the district court
that Direct General had not objected to "anything that's contained
in the first one, two, three paragraphs of the proposed instruction."
However, he never asked the district court to charge only those
three paragraphs.  And he certainly never even suggested that the
court should consider giving these three sentences—about which
he complains for the first time on appeal—as a separate instruction.

Other circuits have held that, in these circumstances, district
courts do not have a duty to parse lengthy, proposed jury instruc-
tions and to instruct the jury solely on the accurate portions of
those proposed instructions.  *See* 9C Wright & Miller, *supra*, § 2552

22  ANDERSON, J., Concurring in part & dissenting in part  21-11070

("[A] number of courts have said that the trial judge need not give a requested instruction if it is inaccurate or deficient in any respect.").  When a requested instruction is "defective," these circuits have suggested that the district court has "no independent duty to supply a correct instruction." *Id.*; *see also Rogers v. Ingersoll–Rand Co.*, 144 F.3d 841, 845 (D.C. Cir. 1998) (acknowledging that the defendant "may have been entitled to a less sweeping instruction" but concluding that "[t]he district court was under no obligation to tinker with the flawed proposed instruction until it was legally acceptable"); *Parker v. City of Nashua*, 76 F.3d 9, 12 (1st Cir. 1996) ("[W]hen the instruction offered by the lawyer is manifestly overbroad, the district judge may reject without assuming the burden of editing it down to save some small portion that may be viable."); *Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 570 (7th Cir. 1984) (noting that "it would be an unwelcome burden on our overworked district judges to obligate them to repair all defects in tendered instructions" when evaluating the district judge's duty "to instruct correctly when the party objecting to an erroneous instruction offers an erroneous substitute"); *Cherry v. Stedman*, 259 F.2d 774, 777–78 (8th Cir. 1958) ("A party cannot claim error in the refusal to give a requested instruction which is not entirely correct, or which it is not possible to give without qualification, or which is so framed as to be capable of being misunderstood.").

I believe this Court should adopt the reasoning of our sister circuits.  Direct General objected generally to the entire requested instruction, and specifically objected to two sentences thereof.

21-11070  ANDERSON, J., Concurring in part & dissenting in part  23

Brink's counsel did not defend the accuracy or relevance of those sentences before the district court.  Once the district court determined that the nine-sentence instruction was partially inaccurate, it had no duty to "edit[] it down to save some small portion that may be viable." *Parker*, 76 F.3d at 12.  In other words, even if Brink "may have been entitled to a less sweeping instruction on" the *Boston Old Colony* duties, "[t]he district court was under no obligation to tinker with the flawed proposed instruction until it was legally acceptable." *Rogers*, 144 F.3d at 845.  Accordingly, the district court did not abuse its discretion by rejecting the proposed instruction because it had no duty to parse the proposed instruction for accurate sentences that otherwise could (or should) have been given.

For the foregoing reasons, I would conclude that Brink has failed to satisfy the first prong of our *Lamonica* test; he has failed to show that his requested instruction correctly stated the law.  For example, he has failed even to offer an argument that the seventh sentence of his requested instruction was not misleading.  That sentence—which says "[t]he focus in this bad faith case is not on the actions of Dustin Brink or his attorneys, but rather on the actions of Direct General"—is misleading as noted above; our *Pelaez* decision holds that the actions of the claimant's attorney are not irrelevant, and that although the focus is on the actions of the insurance company, the actions of the claimant's attorney can be factored into the totality of the circumstances analysis.  Because Brink's requested instruction included misleading statements and because

24   ANDERSON, J., Concurring in part & dissenting in part  21-11070

the district court should have no duty to parse the request and save whatever portions thereof that might be correct, I would hold that Brink has failed to satisfy *Lamonica*'s first prong.  Thus, the district court has not erred.[5]

B.

I turn now to a separate and independent reason that the district court did not commit reversible error in declining to give Brink's proposed instruction.  Brink has also failed to satisfy the third prong of our *Lamonica* test; he has not shown that the failure to give his instruction resulted in prejudicial harm.

Even assuming *arguendo* (contrary to my view above) that the proposed instruction "correctly stated the law" and "dealt with an issue properly before the jury," *Lamonica*, 711 F.3d at 1309, I cannot conclude that the district court committed reversible error because I am satisfied that the district court's rejection of the proposed instruction did not cause prejudicial harm to Brink; and I

---

[5] Moreover, even the three sentences Brink defends on appeal are deficient in part.  The second of those sentences—which lists the several *Boston Old Colony* duties—is misleading.  Florida law is clear that the *Boston Old Colony* duties are merely factors for the jury to consider and that violating one of those duties "does not automatically establish bad faith." *Berges*, 896 So. 2d at 680.  The second sentence that Brink urges on appeal is misleading in that it omitted that caveat.

So, both Brink's original nine-sentence proposed instruction, and the three sentences thereof that he defends on appeal, are deficient in part.  Accordingly, I do not think the district court erred.

21-11070  ANDERSON, J., concurring in part & dissenting in part  25

certainly have no "substantial and ineradicable doubt" in that regard. *MidlevelU, Inc.*, 989 F.3d at 1215 (quoting *Broaddus*, 145 F.3d at 1288). Federal, rather than state, law governs this procedural question of whether the district court committed reversible error. *Pate*, 819 F.2d at 1081–82.

In *Pelaez*, we affirmed a grant of summary judgment in favor of an insurer in a bad faith suit under Florida law. 13 F.4th at 1254. As part of our reasoning, we acknowledged that the "focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Id.* (quoting *Berges*, 896 So. 2d at 677). But we also noted that the Supreme Court of Florida has held that the question of bad faith is for the jury to decide based on the totality of the circumstances, and the jury may consider the actions of the insurer, claimant, and the claimant's attorney when deciding that question. *Id.* Importantly, the Supreme Court of Florida has never held that the jury may *not* consider the claimant's (or his attorney's) conduct when deciding whether the insurer has acted in bad faith. We concluded in *Pelaez* that "there's a difference between *focusing* on a claimant's actions, which would be improper, and *factoring* a claimant's actions into the totality of the circumstances analysis, which is not improper." *Id.*

Not only are we bound by the interpretation of Florida law in *Pelaez*, I think that reading of Florida law is correct. Common sense tells us that it is not possible to evaluate whether a party has acted in bad faith without considering the events to which that

26    ANDERSON, J., Concurring in part & dissenting in part    21-11070

party was responding.  For example, in this case, it is not possible to evaluate whether Direct General's delay in responding to Clem's February 19, 2010 letter constituted bad faith—as opposed to mere negligence or even less—without considering the content of Clem's February 19, 2010 letter.  Contrary to Clem's assertion in his March 12, 2010 letter, the February 19, 2010 letter did not say it was a "time-limited settlement offer."  Quite contrary to a time limit, the letter requested the other insurance "statement from your insured, if possible, so please send that to me at your earliest convenience."  And far from demanding a time-limited response, the February letter requested the information "in the next couple of weeks."  The jury would obviously be influenced in its evaluation of the bad faith issue by the absence of a definite time limit and lack of urgency evidenced in the February letter, as well as the previous year and one-half of efforts by Direct General to settle the case and Clem's lack of responsiveness and lack of any sense of urgency or even desire to settle.

As we said in *Pelaez*, it is appropriate to consider the actions of the claimant's attorney:

> [B]ecause they show how, in the totality of these circumstances, [the insurer] did fulfill its good faith duty to [the insureds].  They show how the failure to settle the lawsuit against the insureds did not result from bad faith of the insurer.

13 F.4th at 1254.

21-11070  ANDERSON, J., Concurring in part & dissenting in part  27

The Supreme Court of Florida has also held that "there must be a causal connection between the damages claimed and the insurer's bad faith." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 902 (Fla. 2010). In other words, in a bad faith failure to settle action, a claimant must show that the insurer's bad faith *caused* the failure to settle and the resulting excess judgment. *See id.* at 901 ("Although an excess judgment is not always a prerequisite to bringing a bad-faith claim, the existence of a causal connection is a prerequisite—in other words, the claimed damages must be caused by the bad faith.").[6] When adjudicating that question, the "focus" is "on the actions [of] the insurer" because there is no "contributory negligence defense" for insurers in bad faith cases—*i.e.*, a claimant's negligence or bad faith cannot "absolve[]" an insurer of bad faith. *Harvey*, 259 So. 3d at 12. That said, a jury may still consider the actions of a claimant or his attorney when deciding whether the insurer's bad faith caused a failure to settle because those actions are relevant to the causation question.

---

[6] The Florida pattern instruction on "legal cause" is as follows:

> Bad faith conduct is a legal cause of [loss] [damage] [or] [harm] if it directly and in natural and continuous sequence produces or contributes substantially to producing such [loss] [damage] [or] [harm], so that it can reasonably be said that, but for the bad faith conduct, the [loss] [damage] [or] [harm]would not have occurred.

*Harvey*, 259 So. 3d at 11 (alterations in original).

28  ANDERSON, J., Concurring in part & dissenting in part  21-11070

With that clarification of what the Florida substantive law provides with respect to the bad faith inquiry in mind, it becomes clear that the district court's refusal to give a three-sentence instruction on the *Boston Old Colony* duties caused no prejudicial harm to Brink.[7]  Three reasons persuade me of this.  First, the jury likely understood that the *Boston Old Colony* duties were part of the duties that Direct General owed to its insureds.  In his closing argument, Brink's counsel repeatedly referenced Direct General's duty to communicate with its insureds and its duty to "treat [its] insured customers the same way as if it had been [Direct General] who was exposed to this $12 million claim."  These, of course, are examples of the *Boston Old Colony* duties.  Moreover, Brink's expert witness emphasized these duties and argued that Direct General failed to comply with them.  Nothing in Direct General's closing argument, or anything else in the trial, cast doubt upon the fact that the specific examples of the insurer's duty referenced by Brink's counsel and expert were part of the insurer's duty that the

---

[7] Of course, federal law governs our determination of whether a district court's failure to give a requested jury instruction resulted in prejudicial harm, but, in any event, there is no tension or difference between the federal law and the Florida substantive law in that both provide for consideration of the totality of the circumstances, including the actions of both Direct General and Brink's counsel.  To the extent that we are trying to measure whether the absence of a particular instruction to the jury caused prejudicial harm, Florida substantive law is relevant in determining whether there was any deficiency in the jury charge and the degree thereof and in evaluating whether the outcome of the trial would have been different if the additional instruction had been given.

21-11070  ANDERSON, J., Concurring in part & dissenting in part  29

district court charged the jury in the more general terms of the pattern instruction. Because the jury likely understood that Direct General's communication (or lack thereof) with its insureds was relevant to Direct General's duty of good faith, I cannot conclude that prejudicial harm resulted from the district court's failure to charge the three sentences Brink now complains about on appeal.[8]

Second, the general language of the pattern jury instruction on bad faith failure to settle fairly encompassed the *Boston Old Colony* duties. The district court instructed the jury as follows: "Bad faith on the part of an insurance company is failing to settle a claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for their interests." The *Boston Old Colony* duties are merely specific examples of the duties described in the pattern instruction. As mentioned, Brink's counsel argued in his closing

---

[8] When deciding whether a failure to give a requested jury instruction is an abuse of discretion under federal law, we may consider what the parties' counsel and expert witnesses said to the jury. *See W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 420, 105 S. Ct. 2743, 2755 (1985) (expressly considering the arguments of counsel, the Court said: "Jury instructions . . . 'may not be judged in artificial isolation,' but must be judged in the 'context of the overall charge' and the circumstances of the case" (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 400 (1973))); *Booth v. Pasco Cnty.*, 757 F.3d 1198, 1209 (11th Cir. 2014) (in rejecting plaintiffs' argument that the district court erred in failing to give their requested instruction, we held: "Plaintiffs have failed to persuade us . . . that they suffered prejudicial harm . . . . [T]he district court permitted Plaintiffs to make the same point during closing argument. . . . [That] mitigated any prejudice that may have otherwise resulted.").

30  ANDERSON, J., Concurring in part & dissenting in part  21-11070

statement that Direct General did not act with due regard for the insureds' interests because they failed to communicate with them and failed to pay attention to Brink's time-limited settlement offer. Nothing in defense counsel's closing argument, nor anything else at trial, suggested that the *Boston Old Colony* duties were not encompassed in the pattern instruction's more general articulation of the duty to "settle a claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for their interests." Because the *Boston Old Colony* duties were fairly encompassed in the jury charge that was given, Brink's suggestion that there was a complete absence of crucial guidance to the jury rings hollow.[9]

Third, overwhelming evidence indicates that no settlement was possible in this case because Brink's counsel clearly did not

---

[9] Brink presented his claim to the jury as bad faith failure to settle when the insurance company could and should have done so. As Brink's counsel argued to the jury in closing: "What's our claim? Our claim is that after February 19, 2010, Direct General failed to settle when under all the circumstances it could and should have done so had it acted fairly and honestly towards its insureds and with due regard for their interest." And the pattern instruction actually given to the jury amply encompassed the gist of the Florida law with respect to that failure-to-settle claim. The other specific *Boston Old Colony* duties about which Brink complains on appeal probably did not contribute at all to failure of a settlement in this case, but, in any event, these specific duties were also encompassed within the general language of the pattern instruction. It is clear to me that, even if Brink's more specific language had been charged, the jury would not have found bad faith or that Direct General's actions in this regard caused the failure to settle.

21-11070  ANDERSON, J., Concurring in part & dissenting in part  31

want to settle.  As discussed above, while the focus in a bad faith case is on the insurer, the claimant's attorney's actions may be "factor[ed]" into the totality of the circumstances analysis.  *Pelaez*, 13 F.4th at 1254.  Here, the overwhelming evidence suggests that any actions of Direct General did not *cause* the failure to settle and the resulting excess judgment against the insureds.  Rather, it shows that Brink's counsel tried to lure Direct General into making mistakes that he could later use to generate a bad faith claim.  From August 18, 2008 to February 19, 2010, Clem did not respond to over two dozen attempts by Direct General to discuss Brink's claims against the insureds and settle them, and he rejected two checks that tendered the $10,000 policy limit to Brink.  In the February 19 letter, Clem extended what he later called a time-limited settlement offer.  However, the February 19 letter itself contained, at best, ambiguous instructions on how and when to comply.  The letter requested that the insurance information from Direct General's insured be sent "to me at your earliest convenience," and said that his client would sign the release (revised as requested) upon receipt of the "requested insurance disclosure" information and the insurance amounts already offered in a "couple of weeks."  Moreover, in his March 12 letter withdrawing the settlement offer, Clem said one reason for doing so was that Direct General failed to comply with a condition of settlement that was not included in the February 19 letter—namely, paying Brink's $900 property damage claim.

32  ANDERSON, J., Concurring in part & dissenting in part  21-11070

As Direct General's counsel argued in his closing argument, Clem had no incentive to settle Brink's claim because, under the terms of his contingency agreement with Brink, he would only be compensated if he recovered from Direct General amounts above the policy limits:

> Part of the agreement . . . was 40 percent of the gross recovery.  Based on the contingency fee contract Mr. Clem would get $0 if the Claimant settled for the $10,000, but under the terms of the agreement by not settling and claiming Direct General acted in bad faith, Mr. Clem now stands to make approximately $3,600,000.
>
> . . . .
>
> Mr. Clem may have 3,600,000 reasons to do what he did but settling wasn't one of them. . . .

Moreover, Brink hired counsel for his bad faith claim against Direct General on the same day he hired counsel for the underlying action against Direct General's insureds, and the above-described contingency fee agreement covered both counsel.  In other words, they were planning a bad faith claim from the very beginning, even before the first communication from Brink's counsel to Direct General.

Direct General acknowledged before the jury that its adjuster should have responded more promptly to Clem's February 19, 2010 letter.  Although Direct General in effect acknowledged negligence and that it had reprimanded the adjuster, it argued that

21-11070  ANDERSON, J., Concurring in part & dissenting in part  33

the error was attributable to oversight and certainly not bad faith, especially in light of the ambiguity of the letter.[10]  Although negligence can be evidence of bad faith, *Boston Old Colony*, 386 So. 2d at 785, it "is not the standard." *Harvey*, 259 So. 3d at 9.

There is overwhelming evidence that the reason there was no settlement in this case was that Brink's counsel did not want to settle.  In order for Brink to receive compensation to reimburse him for any substantial percentage of his injuries, and for his counsel to receive any compensation at all for their services, the only hope was for Clem to generate a bad faith claim.

It seems clear to me that the jury in this case found either that Direct General's agents did not act in bad faith or that their failure to immediately respond to the February 19, 2010 letter did not cause the failure to settle.  It seems clear to me that the jury would have recognized the overwhelming evidence that Brink's counsel had no incentive to settle with Direct General, that their only incentive was to generate a bad faith claim that would both create an enormous benefit for Brink and a nice attorney's fee, and that the failure of this case to settle was because Brink's counsel did not want to settle—not because of Direct General's actions or omissions.  It is clear to me that the jury's verdict would have been

---

[10] The same is true with respect to Brink's argument that Direct General's early letters to its insured were sent to the wrong address, and his suggestion that the insureds might never have received the letters.  The jury likely would have understood that, too, as an oversight.

34  ANDERSON, J., Concurring in part & dissenting in part  21-11070

the same had the district court given Brink's requested jury instruc-
tion, which contained merely more specific examples of the gen-
eral duty of the insurer already included in the pattern instruction
actually given, especially in light of the fact that such specific duties
were amply presented to the jury in Brink's closing argument and
in the testimony of his expert and were not disputed by opposing
counsel or the court.

I have no doubt that the district court's rejection of the pro-
posed instruction did not cause Brink prejudicial harm.  Our stand-
ard of review is deferential: we will only reverse a jury verdict if we
harbor a "substantial and ineradicable doubt as to whether the jury
was properly guided."  *MidlevelU, Inc.*, 989 F.3d at 1215 (quoting
*Broaddus*, 145 F.3d at 1288).  And, under our caselaw, the jury was
allowed to consider the actions of the insurer, the claimant, and the
claimant's attorney when deciding whether the insurer's alleged
bad faith caused a failure to settle.  *Pelaez*, 13 F.4th at 1254.  Ac-
cordingly, I cannot conclude that Brink suffered prejudicial harm
from the district court's failure to give his proposed three-sentence
instruction on the *Boston Old Colony* duties.[11]

---

[11] Unlike the majority, I do not believe that the duty to advise the insured is
an independent theory of liability.  Rather,

> The duty to inform the insured of settlement opportunities is
> one of the duties subsumed within the duty of good faith owed
> by an insurer to an insured.  The failure to inform the insured
> of the settlement offer does not automatically establish bad

21-11070  ANDERSON, J., concurring in part & dissenting in part  35

## C.

In sum, Brink's challenge to the district court's failure to give his requested instruction fails because he cannot satisfy either the first or third prong of our *Lamonica* test.  For the foregoing reasons, I cannot conclude that the district court committed reversible error in failing to give the requested instruction.

Although I join the Court's opinion in Part III.B., I respectfully dissent from the majority's decisions in Part III.A. of the opinion for the Court.  I would affirm the judgment of the district court and the verdict of the jury.

---

faith; it is simply one factor for the jury to consider in determining whether the insurer acted in bad faith.

*Berges*, 896 So. 2d at 680.

Moreover, even assuming *arguendo* (contrary to my belief) that this case did involve a failure to instruct on an independent theory of liability, the overwhelming evidence in this case is that any such deficiency did not cause the failure to settle.  And it is even clearer to me that even if the district court had given the requested instruction about the duty to advise the insured, that would not have changed the jury's verdict.  That possibility was extremely remote in light of the fact that the court's more general instruction fairly encompassed the more specific duty, which, in any event, was already in the jury's mind because of the closing arguments and expert evidence, and in light of the overwhelming evidence that the failure to settle was caused by the fact that Brink's counsel was not going to settle for $10,000.